Argued and submitted June 12, reversed October 31, 2001

# CITY OF EUGENE,
*Respondent,*

*v.*

# DANIEL JOHN LEE,
*Appellant.*

259919655; A110035

34 P3d 690

Daniel J. Stotter argued the cause for appellant. With him on the briefs was Bahr & Stotter.

Jens Schmidt argued the cause for respondent. With him on the brief were Craig J. Capon and Harrang Long Gary Rudnick P.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals his conviction for disorderly conduct under Eugene City Code ECC section 4.725, arguing that the ordinance is unconstitutional as applied to him, under state and federal constitutional provisions protecting his rights to free speech and free religious exercise. We do not reach defendant's arguments concerning the First Amendment to the United States Constitution or his argument concerning the religion provisions of the Oregon Constitution because we find his free expression arguments under Article I, section 8, of the Oregon Constitution, to be dispositive. For the following reasons, we reverse defendant's conviction.

Defendant was charged with a violation of ECC section 4.725 in municipal court, was convicted, and appealed his conviction to the Lane County Circuit Court for a trial *de novo* on the charge. ORS 221.360.[1] Defendant was convicted in circuit court after a trial to the court. On appeal, pursuant to ORS 221.360, we limit our review to the constitutionality of the ordinance as applied to defendant.

The material facts as established at the circuit court trial are as follows. On April 16, 1999, defendant was standing on the Eugene pedestrian mall, which is over 50 feet wide, engaging in street preaching in a loud voice. He was preaching from the King James version of the Bible, pounding on his Bible, and calling out to passersby, accusing them of various sins and making repeated reference to "whores" and "whoremongers."[2] A group of three to five passersby had

---

[1] ORS 221.360 provides:

"In all cases involving the constitutionality of the charter provision or ordinance under which the conviction was obtained as indicated in ORS 221.359 [concerning municipal court convictions for violations of city charters or ordinances], such person shall have the right of appeal to the circuit court in the manner provided in ORS 221.359, regardless of any charter provision or ordinance prohibiting appeals from the municipal court because of the amount of the penalty or otherwise. An appeal may likewise be taken in such cases from the judgment or final order of the circuit court to the Court of Appeals in the same manner as other appeals are taken from the circuit court to the Court of Appeals in other criminal cases. Where the right of appeal in such cases depends upon there being involved an issue as to the constitutionality of the charter provision or ordinance, the decision of the appellate court shall be upon such constitutional issue only."

[2] Defendant presented evidence at trial that the King James version of the Bible contains numerous references to whores and whoremongers, and to actions to

stopped close to defendant to engage in heated debate with him, and defendant referred to one of them, Carter, as a drunkard. Several dozen more bystanders also were grouped around defendant watching and listening. The crowd around defendant was gathered on the south side of the mall, but pedestrian traffic could get by to the north of where defendant and the crowd were gathered.

Jacqueline Silverthorn and her fiancé, John Lawson, walked by the area on the north side of the mall kissing each other, and defendant called out that Silverthorn was a whore and that she was going to hell. Silverthorn and Lawson were upset by defendant's description of Silverthorn as a whore, and reported the event to a nearby police officer, Tinseth.[3]

Tinseth approached defendant and saw that defendant was surrounded by 30 to 35 people, some of whom were becoming enraged by defendant's words. Defendant was waving and thumping his Bible while arguing with those people. Tinseth could hear some noise from about 150 feet away, and when he came closer he identified defendant as the source of some of the noise. Carter, whom defendant had called a drunkard, appeared to be on the verge of engaging defendant in a physical fight. Tinseth knew Carter as "a local transient" who was "very violent," and perceived that defendant was not trying to calm Carter down. Tinseth ordered several people in the crowd to stand back and then arrested defendant.

Tinseth arrested defendant, in part, because he was attracting a large crowd and because the nature of his yelling was causing a disturbance. However, Tinseth's primary reason for arresting defendant "was that he attempted to be provoking fights, a physical altercation right there, with passing

---

be taken against whores. No evidence was presented in this case, however, that defendant threatened to take any actions against the women he perceived to be whores. Thus, no question is presented in this case concerning whether threats can be considered protected speech. *See generally State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) (Article I, section 8, does not protect a threat that instills in the addressee "a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts.").

[3] Tinseth testified at trial that defendant had been on the pedestrian mall several weeks earlier, had called a number of adolescent girls whores, and had been warned that he would be arrested if he did not stop trying to pick fights with people.

people." Defendant was charged with disorderly conduct under ECC section 4.725.

ECC section 4.725 provides, in part:

"A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a) Engages in fighting or in violent, tumultuous or threatening behavior; or

"(b) Makes unreasonable noise; or

"* * * * *

"(d) Obstructs vehicular or pedestrian traffic on a public way[.]"

The city charged defendant, in the alternative, under each of those subsections.

At trial, defendant raised constitutional defenses to the charges against him, arguing that free speech and free religion clauses of the state and federal constitutions gave him a protected right to engage in the type of preaching that he was engaging in when he was arrested. The trial court rejected defendant's arguments and found him guilty of one count of disorderly conduct under the ordinance. The trial court did not specify under which of the sections it found defendant guilty.

On appeal, defendant asserts that his conviction must be reversed because, as a constitutional matter, his conduct cannot support criminal culpability under *any* of the alternatively charged subsections. Defendant argues that, regardless of the ordinance's facial constitutionality, it cannot be constitutionally applied to punish his conduct.

We begin with defendant's arguments under Article I, section 8, of the Oregon Constitution. Defendant relies primarily on *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994), in support of his argument that the ordinance is unconstitutional as applied to him because preaching activity is expressive conduct protected by Article I, section 8. The city responds that, under *Miller*, an ordinance that is content

neutral on its face is subjected only to "rational basis" scrutiny, and asserts that there is a rational basis for the ordinance. As explained below, we reject the city's argument that the success of Article I, section 8, as-applied challenges depends on whether the ordinance, as written, has a "rational basis," and agree with defendant that the ordinance in question, as applied to him under these circumstances, violated Article I, section 8.

■ ■     Article I, section 8, of the Oregon Constitution, provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

*State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), provides the general framework for assessing the constitutionality of legislation in the context of Article I, section 8, challenges. In *Robertson,* the court considered the nature of overbreadth challenges to laws that could be applied in a manner that burdens rights of free expression granted by Article I, section 8. The court identified two types of laws—those aimed at the contents of speech, and those aimed at specific harms, or "forbidden effects," that can be caused by speech rather than aimed at the words themselves. *Id.* at 416-17. Laws aimed at the content of speech violate Article I, section 8, unless the scope of the restraint is wholly confined within some well-established historical exception. *Id.* at 412. The other type of laws, those aimed at "forbidden effects," fall into two different categories: (1) where the statute proscribes means of achieving a forbidden effect and those means include speech or writing, then the court is to determine whether the law reaches privileged communication or whether it can be interpreted to avoid such overbreadth; and (2) where the statute is directed only against causing the forbidden effects, but those forbidden effects may, in fact, be caused by means of language or gestures, the defendant may raise an "as applied" challenge to the statute. *Id.* at 417-18.

The parties contend that the ordinance at issue in this case falls within the last of those categories. The parties assume that the subsections at issue here focus on forbidden effects—unreasonable noise, obstruction of vehicular or pedestrian traffic, and behavior that is violent, tumultuous or threatening.[4] If none of those effects necessarily results from expression, and any of those effects may be achieved solely with nonexpressive conduct, the challenged subsections of the ordinance fall into the third *Robertson* category and "are subject to challenge * * * on vagueness grounds or on the ground that the [ordinance's] reach, as applied to defendant, extends to privileged expression." *State v. Stoneman*, 323 Or 536, 543, 920 P2d 535 (1996). Defendant makes no argument that the ordinance is vague. The question presented, therefore, is whether the ordinance, as applied, burdens privileged expressions.

*Miller*, relied on by both parties here, involved a city ordinance that prohibited street vending of anything other than food, beverages, flowers or balloons. 318 Or at 483. The defendant was cited under the ordinance for selling a joke book to a pedestrian. *Id.* He argued that the ordinance was unconstitutional as applied to him because his joke book contained expressive material protected by Article I, section 8. The court noted that expressive material is not necessarily exempt from all content-neutral regulation, *id.* at 487; conversely, not all content-neutral regulation necessarily survives scrutiny, because some regulations "restrict too greatly 'the free expression of opinion' and 'the right to speak, write or print freely on any subject whatever.' " *Id.* The court further noted that it did not perceive any "rational basis" for the city to distinguish between the sale of expressive materials and the sale of the items allowed by the ordinance. *Id.* at 491.

---

[4] In *State v. Chakerian*, 325 Or 370, 379, 938 P2d 756 (1997), the court interpreted a riot statute that contained similar language concerning "tumultuous and violent conduct," as well as its context, including a disorderly conduct statute that, identically to the ordinance in this case, prohibits "engag[ing] in violent, tumultuous, or threatening behavior." The court concluded that the legislature did not intend to reach protected expression when it prohibited "tumultuous and violent conduct" in the riot statute, and implicitly concluded that the legislature did not intend to reach protected expression when it used similar language in the disorderly conduct statute. *Id.* at 380. Thus, the "violent, tumultuous, or threatening behavior" portion of the disorderly conduct ordinance is properly viewed as coming within the third of the *Robertson* categories.

As the court framed the issue, the question was whether the city's content-neutral regulations "impermissibly burden[ed the defendant's] right of free speech guaranteed by Article I, section 8." *Miller*, 318 Or at 490.

Similarly, the question before us is whether the ordinance at issue here, to the extent that it is viewed as content neutral, impermissibly restricts the free expression of opinion. We briefly recapitulate the circumstances of defendant's alleged crime: Defendant, while located in what is indisputedly a public forum—a city right-of-way that is used as a wide pedestrian mall—was preaching in a loud, albeit unamplified, voice about various sins as described in the King James version of the Bible. His statements, particularly to the extent that they were directed at individuals in the mall, provoked some of his audience, causing those people to engage in heated verbal exchanges with him, and causing at least one person, Carter, to assume what the arresting officer perceived as a fighting stance toward defendant.

■   The first subsection under which defendant was charged prohibits a person from engaging in "fighting or in violent, tumultuous or threatening behavior[.]" ECC section 4.725(a). Although the courts have not previously interpreted this section of the Eugene ordinance, we have interpreted identical language from the state disorderly conduct statute, ORS 166.025(1)(a).[5] In *State v. Cantwell*, 66 Or App 848, 852, 676 P2d 353, *rev den* 297 Or 124 (1984), we rejected a *facial* challenge to this portion of the disorderly conduct statute:

"ORS 166.025(1)(a) makes it a crime to engage in 'fighting or in violent, tumultuous or threatening behavior' with the intent to cause, or recklessly creating a risk of, public inconvenience, annoyance or alarm. Defendants argue that, under certain circumstances, 'behavior' could include actual or symbolic constitutionally-protected speech. *We do*

---

[5] ORS 166.025(1)(a) provides:

"A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a) Engages in fighting or in violent, tumultuous or threatening behavior[.]"

*not read the statute to encompass speech in the term 'behavior,' but construe it to refer only to physical acts of violence. \* \* \*. '[F]ighting' and 'violent, tumultuous or threatening behavior' describe physical acts of aggression, not speech*[.]"
(Emphasis added.)

*Accord State v. Chakerian*, 325 Or 370, 377-78, 938 P2d 756 (1997) (*see* 177 Or App at 498 n 4; *State ex rel Juv. Dept. v. Krieger*, 177 Or App 156, 33 P3d 351 (2001) (speech unaccompanied by physical acts of aggression did not constitute "violent, tumultuous or threatening behavior" for purposes of the disorderly conduct statute); *cf. State v. Harrington*, 67 Or App 608, 614-16, 680 P2d 666, *rev den* 297 Or 547 (1984) (there is no "fighting words" historical exception to the free expression protections afforded by Article I, section 8, of the Oregon Constitution).

There is no principled basis for distinguishing *Cantwell* from the present case. The ordinance, like the identically worded statute, prohibits physical acts of aggression, not speech. There is no evidence in the record that defendant engaged in any physical acts of aggression. There is no evidence that the arresting officer even believed that defendant was *about to* engage in any physical act of aggression. Rather, he arrested defendant because he believed that others who heard defendant's *words* were going to engage in physical acts of aggression. Defendant's speech, although provocative, does not meet the definition of "fighting" or of "violent, tumultuous or threatening behavior."

■ The second subsection of the ordinance under which defendant was charged is ECC section 4.725(b), which provides:

"A person commits the crime of disorderly conduct if, with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"\* \* \* \* \*

"(b) Makes unreasonable noise[.]"

At the outset, we are faced with the question of whether that subsection falls within *Robertson*'s second category or its

third. That, in turn, implicates issues of statutory construction.

If the term "noise" includes expression, then the ordinance prohibits expression as a means of achieving proscribed effects, bringing the ordinance within *Robertson*'s second category, and subjecting it to a test for overbreadth. *See Miller*, 318 Or at 488. The determination of overbreadth would, in turn, depend on the scope and content of "unreasonable," a term that is not defined by the ordinance. Contextually, "unreasonable" can be defined by reference to the ordinance's purposes, *viz.*, to avoid "public inconvenience, annoyance, or alarm." That is, "unreasonable noise," including expression, connotes sound that causes public inconvenience, annoyance, or alarm. Sound can be inconvenient, annoying, or alarming for a variety of reasons, including its volume and duration,[6] as well—significantly—as its content. Thus, if "noise" in ECC section 4.725(b) includes expression, the ordinance is overbroad as prohibiting speech that is "unreasonable" as "inconvenient," "annoying," or "alarming" in its content.[7] *See City of Eugene v. Powlowski*, 116 Or App 186, 840 P2d 1322 (1992) (ordinance which prohibited making "any unnecessary or unreasonably loud or harsh sound by means of a horn" except as a "reasonable warning" was facially overbroad, in violation of Article I, section 8, as burdening constitutionally protected expression).

At least arguably, however, the ordinance could be construed to avoid that result by interpreting "noise" as encompassing only nonexpressive sound. *See Robertson*, 293 Or at 412 (statute should, to the extent reasonably possible, be narrowly construed to avoid facial overbreadth); *accord,*

---

[6] The volume and duration of sound is addressed in separate ordinances, ECC section 4.080 through ECC section 4.084, which prohibit "noise disturbances." Those ordinances contain extensive regulations of the volume, duration, location and timing of sound. Thus, context strongly suggests that "unreasonable" in ECC section 4.725(b) does not include considerations of volume or duration.

[7] *Cf. State v. Blair*, 287 Or 519, 524, 601 P2d 766 (1979) ("Messages that are likely to cause 'annoyance' or 'alarm' are almost limitless; we will not burden this opinion with hypothetical examples of letters from creditors, employers, angry parents, disappointed customers, jealous lovers, or followers of opposing athletic teams that could theoretically lead to filing a criminal complaint.").

*State v. Marker*, 21 Or App 671, 536 P2d 1273 (1975) (employing narrowing construction to parallel provision of state disorderly conduct statute, ORS 166.025, to avoid First Amendment overbreadth challenge).[8] That, in turn, would consign ECC section 4.725(b) to *Robertson*'s third category, implicating an "as applied" analysis.

If, however, subsection (b) were so construed, a conviction under that subsection could be sustained only if there were some content-neutral aspect to the noise defendant was making—*other than* volume, duration, location or timing, which, as noted, are governed by the more specific "noise disturbances" ordinances[9]—that could be deemed "unreasonable" because it caused, or created a risk of causing, "public inconvenience, annoyance or alarm." ECC § 4.725. However, the city points to no aspect of defendant's speech other than its content that was causing, or risked causing, inconvenience, annoyance or alarm. Nor does the record reveal any such basis for finding that defendant's speech caused or risked causing inconvenience, annoyance or alarm based on anything other than its content.

In sum, regardless of how ECC section 4.725(b) is properly pigeonholed in the *Robertson* taxonomy, defendant could not constitutionally be convicted under that subsection. Defendant's religious opinions, although upsetting to some listeners, simply cannot be considered "unreasonable noise" prohibited by the disorderly conduct ordinance without running afoul of Article I, section 8.

---

[8] In *Marker*, we rejected a First Amendment overbreadth challenge to the "unreasonable noise" portion of the disorderly conduct statute by construing it narrowly to prohibit only noise that was noncommunicative, except to the extent that certain types of communication such as communication causing "clear and present danger" were not protected under the First Amendment. 21 Or App at 677-79.

Here, the city has made no explicit argument that Article I, section 8, should be interpreted in the same manner as the First Amendment, or that defendant's speech is not entitled to constitutional protection because one of his listeners appeared ready to engage in a violent response to his words. *Cf. State v. Harrington*, 67 Or App 608, 680 P2d 666, *rev den* 297 Or 547 (1984) (striking down a statute making it unlawful for a person to harass, annoy or alarm another by "abusive or obscene words or gestures in a manner likely to provoke a violent or disorderly response," *id.* at 611, on the ground that no historical exception existed to exclude such speech from the protections of Article I, section 8).

[9] *See* 177 Or App at 501 n 6.

■        Finally, defendant was charged with "[o]bstruct[ing] * * * pedestrian traffic on a public way." ECC § 4.725(d). To obstruct is:

> "**1** : to block up : stop up or close up : place an obstacle in or fill with obstacles or impediments to passing ‹traffic ˜ing the street› ‹veins ˜ed by clots› **2** : to be or come in the way of : hinder from passing, action, or operation : impede, retard ‹unwise rules ˜ legislation› ‹constant interruptions ˜ our progress› **3** : to cut off from sight : shut out ‹the high wall ˜ed the view[.]" *Webster's Third New Int'l Dictionary*, 1559 (unabridged ed 1993).

Similarly, "obstruction" is the "act or condition of being obstructed" or " a condition of being clogged or blocked." *Id.*

       Given those clear and common meanings, defendant did not "obstruct" pedestrian traffic. Even assuming, without deciding, that defendant could be held culpable for the voluntary conduct of the 30 or so other people who had stopped to listen to or argue with him, all of the evidence in this case demonstrates that those who did not wish to stop and listen or argue were able to simply walk past the location where defendant was preaching. In fact, complainants Lawson and Silverthorn were able to—and did—walk unimpeded past the area where defendant was preaching. Street preaching that induces some people in a busy public walkway to stop and listen while others may pass unimpeded is expressive activity that is protected by Article I, section 8. ECC section 4.725(d) cannot constitutionally be applied to defendant under these circumstances.

       Defendant could not, constitutionally, be convicted of violating ECC section 4.725(a), (b) or (d). The trial court erred in concluding otherwise. Consequently, defendant's conviction for disorderly conduct under the ordinance must be reversed.

       Reversed.