Argued and submitted May 11, Eastern Oregon University, La Grande, conviction for disorderly conduct under ORS 166.025(1)(a) reversed; otherwise affirmed October 6, 2004

# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL ATWOOD,
*Appellant.*

## 010097CR; A117917

98 P3d 751

Peter Gartlan, Chief Deputy Public Defender, argued the cause for appellant. On the brief were Peter Ozanne, Executive Director, and Stephanie Hortsch, Deputy Public Defender, Office of Public Defense Services.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Christina M. Hutchins, Assistant Attorney General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant, who was convicted of two counts of disorderly conduct, ORS 166.025(1)(a), (b), appeals, challenging the denial of his motions for judgment of acquittal on those counts. As described below, with respect to the first count, we conclude that the evidence was legally insufficient to allow a trier of fact to infer that defendant engaged in "violent, tumultuous or threatening behavior" within the meaning of ORS 166.025(1)(a), as construed in *State v. Cantwell*, 66 Or App 848, 676 P2d 353, *rev den*, 297 Or 124 (1984). In particular, the evidence could not support a determination that defendant had engaged in the "the use of physical force or physical conduct which is immediately likely to produce the use of such force[.]" *Id.* at 853. However, we conclude, with respect to the second count, that the state presented legally sufficient evidence that defendant, with reckless intent, made "unreasonable noise," ORS 166.025(1)(b), and, particularly, that defendant's purported "communication [was] not intended as such" but was, instead, "merely a guise to disturb persons." *State v. Marker*, 21 Or App 671, 678, 536 P2d 1273 (1975) (quoting *In re Brown*, 9 Cal 3d 612, 619, 108 Cal Rptr 465, 469, 510 P2d 1017 (1973), *cert den*, 416 US 950 (1974)). Consequently, we reverse the conviction for disorderly conduct under ORS 166.025(1)(a) and otherwise affirm.

In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the state, "accepting reasonable inferences and reasonable credibility choices that the factfinder could have made." *State v. Presley*, 175 Or App 439, 443, 28 P3d 1238 (2001) (citations omitted). So viewed, the record substantiates the following facts: On April 2, 2001, defendant's daughter, a student at the North Lake County School, missed her bus home. She went to the school office and asked the district secretary, Julie Smith, if she could use the phone to call defendant to come pick her up. After a brief conversation, Smith told defendant's daughter that she could use the phone only if she improved her attitude. Defendant's daughter responded by leaving the office and calling defendant from a pay phone.

Soon thereafter—and in apparent response to the telephone call—defendant arrived at the school office. By that time, Monica Harmon, the school receptionist, was standing at the front counter and Smith was in the back of the office in the restroom. Defendant appeared angry and demanded to see both Smith and the school principal, Lester McCormick. Harmon walked from the office to the library to get McCormick, and defendant followed her. Defendant, Harmon, and McCormick then returned to the school office, and McCormick stopped outside the office door with defendant. Harmon immediately entered the office and warned Smith not to come out; Harmon remained with Smith in the back of the office.

Outside the office door, defendant, who appeared upset, expressed to McCormick his concern about Smith and asked to see her. McCormick told defendant that he would check if Smith was still in the office. McCormick found Harmon and Smith in the office and told them not to come out because defendant was agitated. McCormick then returned to defendant and told him that Smith was gone for the day. According to McCormick, defendant then "blew up" and

"became very agitated and upset and he slammed, he brought up his fists and pointed his finger and was, he had a concern about something that had taken place with one of the kids.

"* * * * *

"[W]hen he brought up his fists and pointed he wanted me to let [Smith] know that he was going to take off her head and shit down her throat."

Defendant's voice was loud, but he was not screaming. McCormick was not concerned for his own safety because he did not feel that defendant was trying to provoke a response from him. McCormick did have concerns for his staff, fearing that, if Smith came out of the office, "there would have been a situation that the safety of myself and others * * * would have been in jeopardy."

After that initial outburst, McCormick asked defendant to leave. As defendant walked through a set of doors, he

turned around, and screamed, "You let her know I'm going to rip off her fucking head and shit down her throat." Defendant yelled that obscenity "at the top of his lungs." As a result of the incident, several teachers involved in after-school activities came out of their classrooms to see what was happening and much of the school business was halted for the day.

Defendant was charged with one count of menacing, ORS 163.190, and two counts of disorderly conduct, ORS 166.025. The first of the disorderly conduct counts alleged that defendant had engaged in "tumultuous and threatening behavior" in violation of ORS 166.025(1)(a), and the second count alleged that defendant had made "unreasonable noise" in violation of ORS 166.025(1)(b). The case was tried to the court, and the state relied on evidence of defendant's interaction with McCormick as establishing the first of the disorderly conduct counts. As the basis for the second count, the state appears to have relied, without clear differentiation, on either defendant's interaction with McCormick or defendant's screaming as he left the office.

After presentation of the state's case, defendant moved for judgments of acquittal on all counts.[1] With respect to the first disorderly conduct count, defense counsel argued that, as construed in *Cantwell*, ORS 166.025(1)(a) prohibits "physical acts of violence," which the *Cantwell* court also characterized as "physical acts of aggression." *Cantwell*, 66 Or App at 852. Defense counsel continued:

> "And so when you're looking at that statute under [that subsection], there's got to be an act of violence, there certainly was a threat of violence, but there wasn't a physical act. The most that anybody could say was that he had his fist up or that he shook his finger. As I understood the Principal's testimony that was, I took it to understand it was more directed at the Principal as to making a point, not that he was swinging at him or doing anything."

With respect to the second disorderly conduct count, defendant contended that the evidence was legally insufficient to establish that he had made "unreasonable noise"

---

[1] The trial judge acquitted defendant of menacing. That count is not at issue on appeal.

within the meaning of ORS 166.025(1)(b) either in his confrontation with McCormick or when he screamed as he left the office. Relying on *Marker*, defendant contended that the state's evidence was insufficient to permit the court, as the trier of fact, to find that his statements, however loudly declaimed, were not, in fact, intended as communication but, instead, were merely "a guise to disturb persons." 21 Or App at 679.

The court denied defendant's motions as to both of the disorderly conduct counts and subsequently convicted defendant on those counts. On appeal, defendant reiterates his arguments regarding the purported insufficiency of the state's proof as to each count.

■ We begin with the first count and ORS 166.025(1)(a). ORS 166.025 provides, in part:

> "(1)   A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:
>
> "(a)   Engages in fighting or in violent, tumultuous or threatening behavior[.]"

No statute defines the term "violent, tumultuous or threatening behavior." However, in *Cantwell* we addressed the content of that term. There, the defendants, who had been charged with disorderly conduct, demurred, arguing that, under Article I, section 8, of the Oregon Constitution, ORS 166.025(1)(a) was unconstitutionally overbroad and vague. The trial court sustained the demurrer, and we reversed. With respect to overbreath, we concluded that subsection (1)(a) did not proscribe constitutionally protected expression:

> "Defendants argue that, under certain circumstances, 'behavior' could include actual or symbolic constitutionally-protected speech. We do not read the statute to encompass speech in the term 'behavior,' but construe it to refer only to *physical acts of violence*. The subsection of ORS 166.025 relating to speech has already been stricken from the statute. *State v. Spencer*, [289 Or 225, 611 P2d 1147 (1980)]. '[F]ighting' and 'violent, tumultuous or threatening behavior' describe *physical acts of aggression*, not speech[.]"

*Cantwell*, 66 Or App at 852 (emphasis added). Further, with respect to vagueness, we concluded:

> "Recognizing that it would be impossible for the legislature to detail all the potential ways in which such breaches could be committed, we are satisfied that the statutory terminology, 'fighting' or 'violent, tumultuous or threatening behavior,' sufficiently enables a person of common intelligence to know what is prohibited. We construe the terms 'fighting,' 'violent,' 'tumultuous,' and 'threatening,' to have their commonly understood referents to *physical force.* We hold that ORS 166.025(1)(a) makes unlawful only *the use of physical force or physical conduct which is immediately likely to produce the use of such force* and which is intended to create or recklessly creates a risk of public inconvenience, annoyance or alarm."

*Id.* at 853 (emphasis added). *See State v. Chakerian,* 325 Or 370, 378-80, 938 P2d 756 (1997) (considering constitutional challenges to Oregon's antiriot statute, ORS 166.015, and concluding that that statute's prohibition against "tumultuous and violent conduct" forbids only "forms of overt criminal behavior that are unattended by speech of any kind"; referring to ORS 166.025 as a "related" statute that contextually supported the court's conclusion that the legislature "did not intend to reach expression").

In *State ex rel Juv. Dept. v. Krieger,* 177 Or App 156, 33 P3d 351 (2001), we reiterated and applied *Cantwell*'s construction of the scope and content of ORS 166.025(1)(a). There, the youth, while upset with his school principal, had approached two fellow students and asked them to help him blow up the school. *Krieger,* 177 Or App at 158. When they refused, the youth "grabbed hold of [a third student's] shoulder and guided the student to a place where youth could address him privately." *Id.* at 161. That student also refused to assist the youth, telling him that his plans were "stupid" and "crazy." Thereafter, the youth was determined to be within the jurisdiction of the juvenile court based, *inter alia,* on the court's finding that the youth's interactions with his three schoolmates constituted conduct that, if committed by an adult, would constitute disorderly conduct under ORS 166.025(1).

On appeal, we reversed the adjudication as to disorderly conduct. We began by reviewing *Cantwell*, emphasizing that under *Cantwell* the determination of whether the youth had engaged in prohibited "threatening behavior" "must be answered by looking at his physical actions, not his speech." *Krieger*, 177 Or App at 160 (citations omitted). We concluded that "nothing in youth's physical acts, separate from his speech * * * constitutes the sort of physical force or physical conduct likely to produce such force that the disorderly conduct statute prohibits." *Id.* at 160-61. We noted that, in his interactions with his first two schoolmates, the youth had merely asked those students to participate in his plan and "did not use any force in doing so." *Id.* at 161. With respect to his interaction with the third student in which the "youth grabbed hold of the student's shoulder," we reasoned that

> "[w]hile grabbing hold of someone's shoulder is a physical act, it is also a common method of gaining someone's attention and does not rise to the level of physical force required under the statute. Similarly, youth's actions, apart from his speech, do not constitute physical conduct that is immediately likely to produce physical force. We are not persuaded that the act of approaching three students separately and gaining their attention is, in and of itself, immediately likely to produce physical force."

*Id. Accord City of Eugene v. Lee*, 177 Or App 492, 500, 34 P3d 690 (2001) (reversing conviction under Eugene city ordinance that is identical to ORS 166.025(1)(a); the defendant's offensive haranguing of passersby in public place, while wildly gesticulating and thumping his Bible, did not constitute "physical acts of aggression," and there was no evidence that the defendant was about to engage in any physical act of aggression; rather, the officer arrested the defendant "because he believed that others who heard defendant's *words* were going to engage in physical acts of aggression" (emphasis in original)).

With that foundation, we return to the facts of this case. Defendant first contends that his confrontation with McCormick did not involve or constitute "the use of physical force." *Cantwell*, 66 Or App at 853. We agree. Although no post-*Cantwell* case has explicitly defined "physical force" in this context, *Cantwell*'s formulation itself differentiates

between "physical force" and "physical conduct." *Id.* In common usage, the former connotes the actual use of strength or power. *See Webster's Third New Int'l Dictionary* 474, 887 (unabridged ed 1993) (defining "conduct" as "behavior in a particular situation" and "force" as "strength or energy esp. of an exceptional degree: active power"). Indeed, in *Krieger*, actual but incidental physical contact—"grabbing hold of someone's shoulder"—did not rise to the level of physical force required under the statute. 177 Or App at 161. Here, in contrast, there was no physical impact at all; defendant merely gestured angrily. That did not constitute "the use of physical force." *Cf. State v. DeLaura*, 75 Or App 655, 706 P2d 1011 (1985) (disorderly conduct conviction reversed because the defendant was justified in using "physical force" when he "knocked out" three people in a fight).

The closer, and more difficult, question is whether the trier of fact could determine beyond a reasonable doubt that defendant engaged in "physical conduct which [was] immediately likely to produce the use of such [physical] force." That inquiry, in turn, implicates a question about *Cantwell's* formulation that no succeeding case has addressed: "Likely to produce the use of such force" *by whom*? That is, under *Cantwell*, is the defendant liable for engaging in physical conduct "which is likely to produce the use of such force" by (1) the defendant himself or herself or (2) some other person who is either the object of the defendant's conduct or who witnesses that conduct?[2]

Here, however, we need not resolve that question because the evidence was legally insufficient to permit the trier of fact to infer that defendant's physical conduct, when viewed in totality of the circumstances, was "immediately likely to produce the use of such [physical] force," *Cantwell*, 66 Or App at 853, by either defendant or McCormick, the only other person who witnessed that conduct.

■■ We emphasize, at the outset, that ORS 166.025(1)(a) punishes only "physical acts of aggression, not speech."

---

[2] Regardless of which answer is correct—or even if both are correct—the defendant would, of course, have to act with the requisite mental state, *viz.*, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[.]" ORS 166.025(1).

*Cantwell*, 66 Or App at 852. Nevertheless, nothing in *Cantwell*'s constitutional analysis, or in any of our post-*Cantwell* cases, precludes the trier of fact from considering evidence of a defendant's statements as part of the circumstantial context of particular conduct. For example, as a circumstantial matter, a defendant's statement ("Here's how Bonds hit that home run last night") may demonstrate that a seeming "act of physical aggression" (swinging a baseball bat in close proximity to another) was, in fact, not "immediately likely to produce the use of such [physical] force." *Id.* Indeed, we have endorsed the same sort of approach—treating a respondent's expression as circumstantial context for conduct—in reviewing the sufficiency of evidence supporting the issuance of stalking protective orders. *See Boyd v. Essin*, 170 Or App 509, 518 n 11, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (court may rely on stalking respondents' statements as context to determine whether nonexpressive conduct constitutes prohibited "contact").

With that understanding, we do not consider defendant's conduct—raising his fists and pointing at McCormick—in isolation. Rather, we also consider, *as context*, defendant's angry affect, the source of that anger, and his statement that he wanted McCormick "to let [Smith] know that he was going to take off her head and shit down her throat." That context establishes that, while defendant was extremely angry, the object of his anger was Smith, who was not visibly present, and not McCormick. In fact, for that reason, McCormick was not concerned for his own safety—notwithstanding defendant's physical conduct and angry demeanor, McCormick was unconcerned that defendant's conduct was immediately likely to produce the use of physical force against him.[3] We conclude, consequently, that the evidence was insufficient to support a finding that defendant had engaged in physical conduct that was "immediately likely to produce the use of [physical] force" by defendant.

---

[3] To be sure, McCormick was concerned that the situation could become dangerous if defendant encountered Smith. But that never occurred. Moreover, there is no suggestion in this record of any possibility, much less likelihood, of Smith coming out of the office before defendant left.

The state's proof is similarly deficient if the pertinent inquiry is whether defendant's physical conduct was immediately likely to produce the use of physical force *by another person* (presumably, against defendant). Again, McCormick did not feel threatened by that conduct—and, by extension, would not have responded to that conduct with physical force. Further, while McCormick's subjective reaction is not necessarily dispositive of how an objectively reasonable person in his circumstance would have reacted to defendant's conduct, the state identifies no reason (and we perceive none) for why an objectively reasonable person in McCormick's position would have been likely to respond differently.

In sum, the state failed to prove that defendant, with the requisite intent, used physical force or engaged in physical conduct likely to produce the use of such force by either defendant himself or by an objectively reasonable third party responding to that conduct. Accordingly, the trial court erred in denying the motion for judgment of acquittal on the disorderly conduct count under ORS 166.025(1)(a).

■ The second disorderly conduct count alleged that defendant had made "unreasonable noise" in violation of ORS 166.025(1)(b). In *Marker*, we addressed the meaning of "unreasonable noise" in paragraph (1)(b):

> " 'When the word "noise" in the statute is properly construed consistent with the First Amendment and traditional views, it encompasses communications made in a loud manner only when there is a clear and present danger of violence or when the communication is not intended as such but is merely a guise to disturb persons.' "

21 Or App at 678-79 (quoting *Brown*, 9 Cal 3d at 619); *cf. Lee*, 177 Or App at 502 (noting *Marker*'s analysis in context of constitutional challenge to City of Eugene's disorderly conduct ordinance).

As described above, the state's evidence in support of that count was that, after McCormick asked defendant to leave the school, defendant walked through a set of doors, turned around, and screamed an obscene threat at the top of his lungs. Teachers throughout the building heard that outburst and, as a result, work at the school ended for the rest of the day.

Defendant argues that "[t]here is no evidence in the record to support the conclusion that defendant's angry statement was made merely to disturb those present at the school." In response, the state points out that, whatever the content of defendant's comments, screaming "at the top of his lungs" was gratuitous because McCormick was standing in front of defendant. The state further notes that defendant had already, just previously, said virtually the same thing to McCormick. From that evidence, the state contends that a rational trier of fact could conclude that the screamed reiteration was not, in fact, intended to be communicative but was, instead, "merely a guise to disturb" other persons at the school. *Marker*, 21 Or App at 679. We agree with the state. The question of defendant's intent—whether his parting outburst was, as he contends, intended to be communicative or was "merely a guise to disturb"—is a quintessential jury question. The trial court did not err in denying the motion for judgment of acquittal on the second disorderly conduct count.

Conviction for disorderly conduct under ORS 166.025(1)(a) reversed; otherwise affirmed.