Argued and submitted January 21, affirmed June 17, petition for review denied September 17, 2009 (347 Or 43)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ANDREW CURTIS RUFF,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR060550; A134761

211 P3d 277

Paula J. Lawrence argued the cause for appellant. With her on the brief was The Lawrence Law Firm.

Anna Marie Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

Sercombe, J., dissenting.

## EDMONDS, P. J.

■ Defendant appeals a judgment of conviction for possession of controlled substances, ORS 475.894, and assigns error to the trial court's denial of his motion to suppress evidence. We review the trial court's legal conclusions for errors of law, but we defer to the court's findings of historical fact so long as there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). For the reasons expressed below, we affirm.

The following facts are uncontested. Officer Linck, a member of the Newberg Dundee Police Department, went to a city park after a police dispatcher informed him that "an off-duty officer called in [about] a man sitting in the bushes and [the man] had been swinging a samurai type sword around and the information was also given that he was carrying it under his coat." When Linck arrived at the park, there were several people in the vicinity of the sidewalk adjoining the park watching defendant. The officer spoke with the informant who had called the police because he was concerned about defendant's mannerisms and the fact that he had a sword in a public area. As Linck conversed with the informant, defendant came walking up out of the park and got in his vehicle. At the time, Linck was able to observe that defendant had an object with him, although he could not determine if it was a sword.[1]

Linck approached the driver's window of defendant's vehicle and made contact with defendant. Linck asked defendant about the sword, and defendant replied that he had been playing disc golf and that he had used the sword to retrieve the disc when it flew into the bushes. In the meantime, two other police officers, James and Busse, had arrived on the scene. They parked behind defendant's vehicle, thereby blocking it from leaving. Linck's personal contact with defendant at that time ended by Linck taking defendant's driver's license from him.

---

[1] Linck testified, "He had the sword although I couldn't see it. I couldn't see that it was a sword[.] I could see that he had something else on him."

Busse then spoke with the off-duty officer who had called the police. Busse described his conversation with the informant:

"Well, the caller again told me that he was an off-duty officer. He had told me that he had been up on the sidewalk adjacent to River Street along the edge of Hoover Park [and] that he had seen the defendant down in the park and the park is sort of a bit of a ravine—it's down a reasonable distance from the sidewalk so you look down into it—there's a creek down there, it's in a lower area. He'd seen the defendant down there swinging a sword around and he * * * mimicked how the sword was being swung around, which my description of his actions were that it was in a figure eight motion in front of his body. He then also said that the defendant went into the brush for a short period of time, exited, and then put the sword away under what he called a towel."

After speaking with the informant, Busse approached defendant's vehicle, where defendant remained seated. He could see the sword in a scabbard in the back seat area of the vehicle directly behind defendant and on top of other objects. Linck estimated the sword to be between three-and-one-half and four feet in length. Busse asked defendant if what he observed was the sword that defendant had been carrying in the park. Defendant confirmed that it was. Busse asked defendant if he could remove the sword from the scabbard to examine it. Defendant agreed, and Busse retrieved the scabbard from the vehicle. Busse described what he observed:

"The scabbard was wrapped in something similar to maybe like an ace bandage or maybe a cloth wrap of some sort and there were several knives and a couple of long nail spikes in this wrap around the scabbard."

Busse then asked defendant for consent to "look through his vehicle." Initially, defendant hesitated, apparently concerned that the officer was going to remove all of his possessions from his vehicle. Busse asked defendant "whether or not he had anything in [the vehicle] he shouldn't have." Defendant replied that he had a rifle and another sword in the vehicle, although hidden from view. As defendant and Busse continued to discuss whether defendant was going to consent to a search of his vehicle, defendant asked if

he could get a drink from a cooler that was in the back of his vehicle. Busse replied that defendant would need to ask one of the other officers for assistance "because I didn't feel comfortable with him getting into the back of the vehicle by himself not knowing what might have been back there." Defendant then consented to a search of the vehicle based on the assurances that the officers would not dump his possessions on the street and leave them there and that he could get a drink from his cooler with the assistance of another officer.

As defendant got out of the vehicle, James noticed a small hatchet on his hip that had not been visible when defendant was sitting in the vehicle. James was "concerned that [defendant] had a fairly decent sized weapon * * * in close proximity to his hands." James was also concerned under the circumstances that defendant was in possession of additional weapons. Accordingly, James asked defendant to place his hands behind his back so that he could conduct a patdown search of defendant's person for weapons.

During the patdown search, James discovered a small bag that felt like it was "loaded with other things" and could have contained small knives, needles, darts, or razor blades. When asked, defendant agreed to remove the bag from his pocket but declined to allow James to look inside the bag. James put the bag on top of the vehicle without looking inside it. He then continued the patdown search and felt a "hard object and it was a couple inches long and towards the end of one end was a bend." From where James was standing, he could see down inside of the pocket, which was "kind of flop[ped] open," and, in the pocket, he observed a pipe commonly used for smoking illegal drugs. James then removed the pipe, handcuffed defendant, and started to open the small bag that had been taken from defendant's pocket. However, before James opened the bag, defendant informed him that there were illegal drugs in it. James then opened the bag and found drug paraphernalia and some small baggies with white residue inside. James advised defendant of his *Miranda* rights, and defendant confirmed thereafter that the white residue in the baggies was methamphetamine.

Meanwhile, the other officers had discovered a second pipe with white residue under the driver's seat of defendant's vehicle while conducting the search of the vehicle. As a

result of the above discoveries, defendant was charged by indictment with unlawful possession of methamphetamine. Before trial, defendant moved to suppress "all evidence obtained as the result of an unlawful stop and warrantless search [and] seizure in this matter, and all derivative evidence therefrom, in violation of the state and federal constitutions and state statutes." After conducting a hearing, the trial court denied defendant's motion to suppress, and defendant was convicted of unlawful possession of methamphetamine.

■ On appeal, defendant essentially makes three arguments:

> "The trial court in this case ruled that the stop in this case was justified by reasonable suspicion [that] defendant had committed the crimes of Disorderly Conduct and Carrying a Concealed Weapon. However, the facts of the case do not support a finding of reasonable suspicion for either crime.
>
> "* * * * *
>
> "In addition, the sword defendant was observed carrying was a samurai-type sword. A samurai-type sword is not * * * 'a knife having a blade that projects or swings into position by force of a spring or by centrifugal force, any dirk, dagger, ice pick, . . . or any similar instrument' as required to violate * * * ORS 166.240, Carrying a Concealed Weapon. In the alternative, even if officers initially had reasonable suspicion for the crime of Carrying a Concealed Weapon, then it dissipated once the officers personally inspected the sword.
>
> "Finally, in the alternative, even if the stop was justified, the subsequent 'officer safety' search of defendant was not lawful. The officers did not reasonably suspect that defendant was armed and dangerous to the officers or others present, and defendant did not consent to the search."[2]

The first issue is whether Linck acted lawfully when he detained defendant by taking his driver license from him.

---

[2] We do not understand defendant to argue that his consent to search was involuntary. Rather, defendant refers to the circumstances leading up to the consent to search to argue that defendant was not a legitimate threat to the officers' safety.

The state agreed at oral argument that defendant was deprived of his freedom of movement at the point in time that Linck took possession of his driver license. *See State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991) (holding that a deprivation of freedom of movement occurs under Article I, section 9, when a police officer temporarily restrains a person's liberty). However, the state argues that defendant's detention was justified by the officer's reasonable suspicion that defendant had been carrying a concealed weapon in the park. An officer may legally detain a person if the officer "reasonably suspects that [the] person has committed or is about to commit a crime." ORS 131.615(1). A reasonable suspicion of criminal conduct exists when a police officer has a subjective belief that a crime has been committed and that belief is objectively reasonable under the totality of the circumstances. ORS 131.605(5).

■        ORS 166.240(1) provides that it is unlawful for a person to carry a concealed weapon:

> "[A]ny person who carries concealed upon the person any knife having a blade that projects or swings into position by force of a spring or by centrifugal force, any dirk, dagger, ice pick, slungshot, metal knuckles, or *any similar instrument by the use of which injury could be inflicted upon the person or property of any other person*, commits a Class B misdemeanor."

(Emphasis added.) The terms "dirk" and "dagger" are not defined by statute. We conclude therefore that the legislature intended that the ordinary meanings of the words apply. *State v. McJunkins*, 171 Or App 575, 579, 15 P3d 1010 (2000). A "dagger" is defined as a "short knife used for stabbing." *Webster's Third New Int'l Dictionary* 570 (unabridged ed 2002). A "dirk" is commonly understood to mean a "long straight-bladed dagger[.]" *Id*. at 642. The historical function of a dagger was to pierce armor. *McJunkins*, 171 Or App at 579. Historically, daggers existed in several varieties; a dirk was one kind of dagger with a blade of approximately 18 inches. *Id*. While a three-and-one-half foot long samurai sword is not a dirk or a dagger, it could qualify as an "other similar instrument" for purposes of ORS 166.240(1) if it also is designed for stabbing.

By ordinary definition, a sword is "**1 a :** a weapon with a long blade for cutting or thrusting set in a hilt usually terminating in a pommel and often having a tang or a protective guard where the blade joins the handle * * * **2 a :** an instrument of destruction." *Webster's* at 2314. In *State v. Tucker*, 28 Or App 29, 33, 558 P2d 1244, *rev den*, 277 Or 491 (1977), we explained:

> "The phrase here in controversy, 'any instrument by the use of which injury could be inflicted upon the person or property of any other person' is preceded by a specific list of weapons, *i.e.*, firearms, knives, metal knuckles, and slung shot. We construe this phrase to embrace those items which are similar in nature to the enumerated objects, and are designed and intended primarily as weapons to inflict bodily injury or death. Accordingly we hold this statute applies to items not enumerated which are *designed and intended primarily to inflict injury* on the person or property of another."

(Emphasis added.)

Here, given the description provided, Linck could reasonably suspect from the information furnished by the informant that the sword in defendant's possession while he was in the park was designed primarily to inflict injury on the person or property of another by stabbing, similar to the function of a dirk or dagger, and that the sword had been concealed on defendant's person. Linck was aware that the informant, an off-duty police officer, had told the dispatcher that defendant had been carrying a sword under his coat while in the park. When Linck arrived at the park, he was able to observe that defendant was carrying an object, but he "couldn't see that it was a sword." When Linck initially contacted defendant while defendant was seated in his vehicle, the sword was in a scabbard wrapped in a scarf. Also, defendant admitted that he had been using a sword while playing disc golf in the park. Based on all of these circumstances, we conclude that Linck held an objectively reasonable suspicion that defendant had violated ORS 166.240(1) while in the park.

■        Defendant also argues that, even if the officers had a reasonable suspicion that he had been carrying a concealed

weapon, the suspicion dissipated once the officers were able to examine the sword. We disagree. That argument is premised on the contention that the sword was not a "weapon" within the meaning of ORS 166.240(1), a notion that we reject for the reasons explained above. Moreover, not only did the officers' examination of the sword reinforce their suspicion that defendant was carrying a concealed weapon, but their discovery of the throwing knives concealed in the scarf wrapped around the scabbard added to that suspicion.

The dissent disagrees with the above analysis, asserting that the legislature could not have intended "large stabbing weapons" to constitute concealed weapons under the statute. 229 Or App at 109-10 (Sercombe, J., dissenting). Preliminarily, it is important to note that the dissent does not appear to dispute that the police had reasonable suspicion to believe that the sword had, in fact, been concealed on defendant's person while he was in the park, regardless of its size. Indeed, the informant, an off-duty police officer, had told the dispatcher that defendant was carrying the sword under his coat while in the park.

As importantly, the dissent does not cite any legislative history that supports its assertion that the legislature would have intended an 18-inch dirk to fall within the prohibition of ORS 166.240(1) but also would have intended to exclude from the coverage of the statute a 42-inch sword that, based on the record before us, is capable of being hidden from view by a coat. In *Tucker*, we interpreted a version of ORS 166.240 that included a prohibition against the carrying of "*any* revolver, pistol, *or other firearm*" as well as "*any* dirk, dagger, * * * or any instrument by the use of which injury could be inflicted upon the person or property of another." (Emphasis added.) In 1985, the legislature removed the reference to "any revolver, pistol, *or other firearm*" from ORS 166.240 and amended ORS 166.250 to make it unlawful for a person to "carr[y] *any* firearm concealed upon the person, without having a license to carry such firearm[.]" Or Laws 1985, ch 543, §§ 2 and 3 (emphasis added). The 1985 legislature also left in ORS 166.240 the reference to "*any* dirk, dagger * * *." (Emphasis added.)

■     Because *Tucker* was decided in 1977, the 1985 legislature would have been aware of our conclusion that the statute applied to any object not enumerated in the statute that is designed and intended primarily to inflict injury on the person or property of another. In light of the 1985 amendments to the statute, as well as the language of the present version of ORS 166.240(1), we conclude that the legislature intended that the statute be construed comprehensively to apply to "any" object designed and intended primarily to inflict injury on a person or property that is capable of being concealed upon the body of a person without regard to whether the object is relatively small or large.[3] That understanding of the intended breadth of the statute leads us to respectfully disagree with the dissent's interpretation because it would add a further limitation to the scope of the statute that does not appear in the language of the statute. *See* ORS 174.010 (providing that "the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted").

■     Finally, defendant challenges the patdown of defendant's person that resulted in the discovery of the methamphetamine that resulted in his conviction. In defendant's view, the officers did not have a reasonable suspicion that defendant was armed and dangerous—a point of view belied by defendant's concealment of a samurai sword, throwing knives, and six-inch spikes; possession of a hatchet; and admissions that he had a rifle and another sword in his vehicle.

For the above reasons, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

[3] *See, e.g., Tucker*, 28 Or App at 33 (holding that "nunchaku sticks" are "instruments" under ORS 166.240 because "[t]hey are primarily designed and intended for use in combat with the purpose of causing injury or death"); *see also State v. Courtier*, 166 Or App 514, 519, 997 P2d 894 (2000) (holding that nunchaku sticks, "consisting of two wooden sticks, with swivels on each end and connected with a chain," are a dangerous or deadly weapon for purposes of Portland City Code §14.32.100, which prohibits carrying "any dangerous or deadly weapon in a concealed manner"); *cf. State v. Turner*, 221 Or App 621, 191 P3d 697 (2008) (holding an officer lacks reasonable suspicion that a defendant was concealing a ninja sword at the time that the officer motioned for defendant to pull over).

**SERCOMBE, J.,** dissenting.

I disagree with the majority's conclusion that concealment of a samurai sword is proscribed by ORS 166.240, the concealed weapons statute. In my view, the statute regulates switchblade knives, dirks, daggers, ice picks, slungshots, metal knuckles, and other "similar instruments," *i.e.*, small, concealable weapons that are designed to produce personal injury and could inflict similar types of injuries as the listed weapons. I construe the concealed weapons statute not to include large weapons that are not readily concealable on a person.

Because of my different understanding of the meaning of ORS 166.240, and in light of the analysis below, I would conclude that the police officers did not reasonably suspect that defendant had committed or was about to commit a crime when they stopped him. The evidence sought to be suppressed was seized as a result of that unlawful stop. Under *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005), that evidence should have been suppressed because its discovery was not otherwise inevitable or sufficiently attenuated from the unlawful police conduct. I respectfully dissent from the majority's conclusion to the contrary.

I agree with the majority that defendant was stopped when his automobile was blocked by the police vehicles and a police officer took defendant's driver's license. By that time, the police officers knew that defendant had been swinging a samurai sword while sitting by himself in the park bushes and that defendant had carried the sword under his coat afterwards. The state contends that the stop was justified under ORS 131.615(1) and Article I, section 9, of the Oregon Constitution because the police had reasonable suspicion that defendant had committed the crimes of disorderly conduct, ORS 166.025(1), and carrying a concealed weapon, ORS 166.240(1).

In my view, there was no reasonable suspicion that defendant violated ORS 166.240(1), the concealed weapons statute, by carrying an approximately four-foot sword under his coat. ORS 166.240(1) provides:

"Except as provided in subsection (2) of this section, any person who carries concealed upon the person any knife having a blade that projects or swings into position by force of a spring or by centrifugal force, any dirk, dagger, ice pick, slungshot, metal knuckles, or *any similar instrument* by the use of which injury could be inflicted upon the person or property of any other person, commits a Class B misdemeanor."

(Emphasis added.)

The issue, then, is whether an approximately four-foot samurai sword is a "similar instrument" to a switchblade knife, dirk, dagger, ice pick, slungshot, or metal knuckles. The majority reasons that, although a "samurai sword is not a dirk or a dagger, it could qualify as an 'other similar instrument' for purposes of ORS 166.240(1), if it also is designed for stabbing." 229 Or App at 104. Because a sword is designed for stabbing, the majority concludes that it is a "similar instrument" under the statute and that the officers had an objectively reasonable suspicion that defendant was carrying a weapon within the meaning of ORS 166.240(1). *Id.*

In *State v. Tucker*, 28 Or App 29, 33, 558 P2d 1244, *rev den*, 277 Or 491 (1977), we construed the phrase "any instrument by the use of which injury could be inflicted" in a prior version of ORS 166.240(1) to mean "items not enumerated which are designed and intended primarily to inflict injury on the person or property of another." The word "similar" was added to the phrase "or any instrument" in 1985. Or Laws 1985, ch 543, § 2. I agree that a "similar instrument" is one that is designed to produce the same type of injury as the enumerated weapons, that is, stabbing or blunt force injuries. But I do not think that similarity in the type of injury produced is the only point of comparison used to determine what is a "similar instrument." For example, a dirk is not similar to a lance used in jousting, even if both weapons produce stabbing injuries.

To be "similar" means to be "**1 :** having characteristics in common **:** very much alike" or to be "**2 :** alike in substance or essentials" or "**3 a :** having the same shape." *Webster's Third New Int'l Dictionary* 2120 (unabridged ed 2002). It seems to me that a "similar instrument" is one that

shares similar physical characteristics to the listed weapons. Because the statute primarily defines the covered weapons as ones that can be carried on the person, the size or concealability of the weapon would seem to be an essential characteristic. A "similar instrument" is one that is similar in size to the listed instruments. Swichblades, daggers, dirks, stilettos, and ice picks are all relatively small stabbing weapons. Swords are large stabbing weapons. I do not read the statute to include large stabbing weapons as "similar instruments."

There was no reasonable suspicion that defendant committed the crime of disorderly conduct. ORS 166.025(1) defines that crime and provides, in part:

"A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a)   Engages in fighting or in violent, tumultuous or threatening behavior[.]"

In *State v. Cantwell*, 66 Or App 848, 853, 676 P2d 353, *rev den*, 297 Or 124 (1984), we construed the statutory phrase "violent, tumultuous or threatening behavior" to make unlawful only

"the use of physical force or physical conduct which is immediately likely to produce the use of such force and which is intended to create or recklessly creates a risk of public inconvenience, annoyance or alarm."

Similarly, in *State v. Atwood*, 195 Or App 490, 497, 98 P3d 751 (2004), the court held that the defendant's actions of becoming agitated and upset, slamming and bringing up his fists, and pointing his finger at another person were legally insufficient to support a conviction under ORS 166.025(1)(a). We concluded that "there was no physical impact at all; defendant merely gestured angrily" and "[t]hat did not constitute 'the use of physical force.' " *Id*. at 498; *see also City of Eugene v. Lee*, 177 Or App 492, 500, 34 P3d 690 (2001) (reversing conviction under city ordinance that was identical to ORS 166.025(1)(a) because the defendant's offensive

haranguing of a passerby in a public place, while wildly gesticulating and thumping his Bible, did not constitute "physical acts of aggression," and there was no evidence that the defendant was about to engage in any physical act of aggression).

Defendant's actions here may have caused some level of alarm to witnesses, as in *Atwood* and *Lee*. But waving a sword, while sitting by oneself in the bushes, is hardly "violent, tumultuous or threatening behavior" for the purposes of ORS 166.025(1). Defendant's actions did not involve the use or imminent use of physical force in the sense required by the statute. Accordingly, there was no reasonable suspicion that defendant had committed the crime of disorderly conduct.

Because the evidence seized was a product of an unlawful stop, I would reverse the denial of defendant's motion to suppress. I dissent from the majority's contrary conclusion.