2011 VT 24

## State of Vermont v. Brian Albarelli

[19 A.3d 130]

No. 09-191

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 18, 2011

---

*Thomas J. Donovan, Jr.,* Chittenden County State's Attorney, and *Andrew R. Strauss,* Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, *Anna Saxman,* Deputy Defender General, and *Alfred Waldstein,* Law Clerk, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Brian Albarelli appeals his conviction and sentence for disorderly conduct. He maintains that (1) the jury did not have sufficient evidence of threatening behavior to convict him of disorderly conduct; (2) his waiver of trial counsel was not knowing and intelligent and therefore was ineffective; and (3) the trial court's construction of the disorderly conduct statute was vague and overbroad and accordingly punished constitutionally protected speech. Because we agree that the jury did not have sufficient evidence before it to convict defendant of disorderly conduct, we reverse and do not reach the other issues that defendant raised.

¶ 2. On September 19, 2008, a little more than a month before the United States general election, defendant approached a "Vermonters for Hope" table that was stationed on the Church Street Mall in Burlington.[1] The purpose of the table was to register voters and promote Barack Obama's presidential campaign. On that day, it was staffed by a volunteer. Defendant engaged the volunteer, stating that he was confused and unsure of who to vote for. Although he initially approached the table "sheepishly," his demeanor soon changed, and his behavior "began to escalate a little." He started ranting about the Obama candidacy and grew agitated as he talked about Zbigniew Brzezinski, a former National Security Advisor to President Carter who endorsed the Obama campaign. His voice "rose a bit," he became "more adamant" about what he was saying, and he started to act "like he was on a soap box." One volunteer noted that at this point his behavior "was very distracting," and she asked him to leave, stating that she "didn't want to argue with him" and that she didn't "want to have to call the police on [him]." Defendant, however, persisted in his rant. Although much of what he was saying "wasn't making a lot of sense," witnesses reported that defendant was "loudly expressing his views," accusing Obama of being a terrorist, and "basically insinuating that [those people] . . . approaching the table to register to vote . . . were terrorists." At times, his hands were in his pockets or his arms were crossed across his chest; at other times his hands were "gesturing wildly." He had been at the table for about 20 minutes when two police officers arrived. The police determined that the table volunteer

---

[1] The record indicates that defendant had approached the table and engaged in "rude" and "snarly" behavior on at least two prior occasions.

would press charges against him if defendant did not leave. Defendant then left.

¶ 3. At the time of defendant's actions, the volunteer was on the opposite side of the table, with the table between her and defendant. She testified that she felt threatened during this incident "because [defendant's] voice was raised, he was yelling," and he was "angry," and because of "his persistence in staying there," his "pacing, and his adamancy about what he was saying." She stated that she felt threatened by "the tone, the escalation of what [defendant was] saying, and the way [he was] saying it," and because "it was almost . . . like [he was] intentionally disrupting me registering . . . somebody to vote." She testified that defendant's conduct was "unnerving" and "I felt threatened. I felt afraid." At the same time, she noted that she did not believe that defendant was going to hit her — just that he had been "a little close for comfort."

¶ 4. The second eyewitness who testified was at the table during most of the incident in order to register to vote. She testified that although defendant was "[a]ggressive, hostile, fidgety, [and] nervous" during the incident, she could not recall him making any threats. She stated that he was giving "his views on Obama in . . . [a] hostile, aggressive[], inappropriate way," but that she felt that "[defendant] thought that that was the best way to let . . . people know what he thought and what he believed to be true" and that "he thought that he was informing [the onlookers]." When she told defendant that she felt that he was expressing himself in an inappropriate way, "[h]e took a few steps closer" so that he was within two to three feet of her and intimated that he did not care how she felt about his behavior. She decided that she "was not talking to someone who was mentally stable." She "was scared" because "I didn't really know what he was going to do." She stated that "he was acting irrational . . . [h]e was pacing, he was fidgeting, I thought he was on something." She eventually held a clipboard up between her and defendant "sort of like . . . here's the wall, . . . don't come any closer," because she "didn't feel comfortable."

¶ 5. Two days later, on September 21, defendant again approached the Vermonters for Hope table, this time accompanied by another young man. The two men "completely cut . . . off" the table from the stream of people on Church Street. Though he was not yelling, he was "sort of intense, and angry, and strange," and

one of the volunteers called the police. A uniformed police officer arrived soon thereafter. She asked defendant for his name and what the commotion was about. Defendant offered only that he was expressing his freedom of speech and that he did not have to give his name. When defendant persisted in this position, the officer issued him a citation to appear in court to answer a charge of disorderly conduct.

¶ 6. Defendant was charged in Chittenden District Court with one count of disorderly conduct in violation of 13 V.S.A. § 1026(1), a misdemeanor. The information indicated that the disorderly conduct occurred on September 19, 2008[2] and that defendant "recklessly created a risk of public inconvenience or annoyance when he engaged in violent, tumultuous or threatening behavior, TO WIT, by yelling aggressively."[3] The charge generally tracked the statutory language, adding the "TO WIT" phrase to explain specifically how defendant violated the statute. Defendant appeared without counsel and indicated that he intended to represent himself, stating that he did not need a lawyer because his case was "clear cut." After a jury trial, defendant was convicted and was given a sentence of four to five days on a work crew. He obtained counsel and filed a motion to dismiss and for a judgment of acquittal. After argument, and in advance of sentencing, the court denied the motion without explanation. Defendant then appealed to this Court.

¶ 7. Defendant challenges the disorderly conduct conviction on two grounds. First, defendant contends that the State did not present sufficient evidence to prove that he engaged in "threatening behavior." Second, defendant argues that the trial court's construction of the disorderly conduct statute, 13 V.S.A. § 1026(1), punished constitutionally protected speech. Specifically, defendant maintains that the trial court's jury instruction that, to convict, the jury had to find that defendant "engage[ed] in threatening behavior by yelling aggressively" was erroneous because it permitted conviction based on "the tone and volume of speech with nothing more" and because the phrase "yelling aggressively" is vague and overbroad. Therefore, defendant alleges, the statute as

---

[2] The original information specified that the disorderly conduct occurred on or about September 20th. At arraignment, the State amended the information to specify the date contained in the text.

[3] The TO WIT clause was added in the amended information.

applied to him by the trial court violates the First Amendment to the United States Constitution and Chapter I, Article 13 of the Vermont Constitution.·

¶ 8. We do not reach the jury instruction issue because we conclude that the evidence was insufficient to convict. To reach the evidence sufficiency issue, however, we must examine the governing statute and how the court instructed the jury on the elements of the offense.

■ ¶ 9. Disorderly conduct statutes have long raised free speech concerns. See, e.g., *Gregory v. City of Chicago*, 394 U.S. 111, 121 (1969) (Black, J., concurring) (noting "serious First Amendment problems" raised by city disorderly conduct ordinance). In an effort to mitigate such concerns, many states, including Vermont, have modeled their statutes after the Model Penal Code, which limits the types of conduct that can be classified as disorderly. See *State v. Read*, 165 Vt. 141, 147, 680 A.2d 944, 948 (1996); 13 V.S.A. § 1026; see, e.g., Conn. Gen. Stat. § 53a-182 (2001); N.Y. Penal Law § 240.20 (McKinney 2008); N.D. Cent. Code § 12.1-31-01 (2001). Vermont's disorderly conduct statute provides a common intent element: "with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof." 13 V.S.A. § 1026. It then contains five alternative specifications of the criminal conduct. The alternative charged in this case is that defendant engaged "in fighting or in violent, tumultuous or threatening behavior." *Id.* § 1026(1). As we have previously held, the language of the statute properly interpreted proscribes conduct, not speech, and therefore does not penalize speech. *Read*, 165 Vt. at 146, 680 A.2d at 947; see *State v. Begins*, 147 Vt. 45, 48, 509 A.2d 1007, 1009 (1986) (rejecting vagueness challenge to "violent, tumultuous or threatening behavior" provision in 13 V.S.A. § 1026(1)). Courts considering identical provisions from other states have reached the same conclusion. See e.g., *State v. Indrisano*, 640 A.2d 986, 995 (Conn. 1994) (noting that Connecticut's provision "proscribes conduct"); *People v. Stephen*, 581 N.Y.S.2d 981, 983 (Crim. Ct. 1992) (concluding that relevant subdivision "quite clearly punishes conduct . . . rather than speech"); *State v. Bornhoeft*, 2009 ND 138, ¶ 11, 770 N.W.2d 270 ("It is important to distinguish between disturbing or threatening conduct proscribed by the disorderly conduct statute and content of speech."); *State v. Cantwell*, 676 P.2d 353, 356 (Or. Ct. App. 1984) ("We do not read the statute to

encompass speech in the term 'behavior,' but construe it to refer only to physical acts of violence.").

¶ 10. The State charged in the information that defendant had engaged in either violent, tumultuous or threatening behavior without specifying which it relied upon. The trial court decided that there was no evidence of violent behavior so it did not charge the jury on that element. It also decided not to charge the jury that defendant's behavior could be found to be "tumultuous," the second element in the statutory language. Apparently, the court concluded that the element of tumultuous behavior, especially in the context of behavior in an open public place in which many persons congregated, was overbroad and raised a serious risk of criminalizing protected speech.[4] Thus, the court limited the definition of the crime to the third element — that defendant engaged in "threatening behavior."

¶ 11. In narrowing the charge in this way, the court followed our approach in *State v. Read* to limit the definition of the crime to encompass conduct and not speech. 165 Vt. at 146, 680 A.2d at 947; see also *State v. Colby*, 2009 VT 28, ¶ 10, 185 Vt. 464, 972 A.2d 197 ("[T]o show that a defendant violated § 1026(4), the State must prove that a defendant's conduct — and *not* the content of the activity's expression — substantially impaired the effective conduct of a meeting." (quotation omitted)). In *Read*, we construed a different subsection of the disorderly conduct statute; this subsection criminalizes use of "abusive or obscene language" in a public place. 13 V.S.A. § 1026(3). In order to hold the statute constitutional, we adopted a narrowing construction of the language so that it applies only if the defendant uses fighting words as defined in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). Under *Chaplinsky*, fighting words are words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572.

---

[4] The court explained its action in its first discussion on the proposed charge and during the argument over defendant's motion for judgment of acquittal. In effect, the trial court granted a judgment of acquittal with respect to the charge that defendant engaged in tumultuous behavior. The State opposed this action arguing that its main theory was that defendant's behavior "was chaotic as defined as tumultuous" and the ruling eliminated that theory. The State, however, could not appeal the ruling. See Reporter's Notes, V.R.Cr.P. 29 (State cannot appeal entry of a judgment of acquittal). As a result, this decision is not before us, and we do not address it. We consider this case as if the State charged defendant only with threatening behavior.

¶ 12. The court defined the term "threatening behavior" in the jury instructions as follows:

> The third essential element is that [defendant] engaged in threatening behavior. "Threatening behavior" means behavior that communicates an intention to do harm to another person. You must consider whether [defendant's] conduct threatened the people he encountered at the voter registration table on Church Street.

The court added that the jury "should not consider the content of [defendant's] statement, except to the extent that . . . it contains a threat of violence or harm to another person, [for it] is not the content of his statements which is at issue." It further noted that "[p]olitical speech is specially-protected in our political system by the First Amendment of our Constitution" and that "conduct, including speech which is threatening to another person, is not protected and may be the basis for a charge of disorderly conduct."

■ ■ ¶ 13. The language of the instruction was unclear on whether it expressed an objective or a subjective standard. In *State v. Allcock*, we held that the fighting words standard of *Read* is "an objective, not a subjective, standard." 2004 VT 52, ¶ 7, 177 Vt. 467, 857 A.2d 287 (mem.). Similarly, in *Colby*, we narrowed § 1026(4), which penalizes behavior that "disturbs any lawful assembly or meeting of persons," and interpreted the law to require the State to prove that the defendant's conduct "substantially impaired the effective conduct of a meeting." 2009 VT 28, ¶ 10 (quotation omitted). We noted that this "standard is an objective one" and that "the fact finder may not consider the subjective effect of the content of a defendant's expressive conduct on those assembled." *Id.* ¶ 11. Instead, the fact finder had to consider, given the timing, duration, and intensity of the event, whether a meeting reasonably would have been substantially impaired. *Id.*

■ ¶ 14. For the same reasons that we adopted an objective standard in *Read* and *Colby*, we adopt an objective standard here. Particularly where, as here, the alleged threatening activity includes speech, a subjective standard that judges whether defendant engaged in threatening behavior based on the reaction of particular persons can interfere with First Amendment protec-

tions. Thus, the standard must be objective and turn on how a reasonable person would view defendant's behavior.

¶ 15. Before we determine whether there was sufficient evidence to convict defendant, we must deal with a preliminary point. The State argues that defendant failed to preserve his argument that the evidence was insufficient to convict him. Defendant responds that he preserved this argument by raising it in a motion to enter a judgment of acquittal filed within 10 days of the discharge of the jury.

¶ 16. Vermont Rule of Criminal Procedure 29(c) provides that a motion for judgment of acquittal may be filed within 10 days after the jury is discharged, and it is not "necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury." Accordingly, we have held that a timely post-verdict motion for judgment of acquittal preserves the issue of the sufficiency of the evidence for appeal. *State v. Brooks*, 163 Vt. 245, 254, 658 A.2d 22, 29 (1995). The State argues, however, that the motion defendant filed "was a Rule 29 motion for judgment of acquittal in name only, as it argued solely issues of law, not the sufficiency of the evidence." As the State points out, the "sole issue" raised by a proper motion for judgment of acquittal is the sufficiency of the evidence to convict. *State v. Chenette*, 151 Vt. 237, 241, 560 A.2d 365, 369 (1989). Here, defendant was arguing that the evidence was insufficient under the First Amendment to the United States Constitution. The heart of the argument was that defendant was making protected political statements: "The delivery of those statements may have been loud and unrelenting; the information conveyed may have been unpopular; the audience may have been apprehensive. However, the Defendant's conduct consisted of oral communication with his hands in his pockets." Although couched in constitutional language, the argument was essentially the same as the defendant makes here. We conclude that the motion for a judgment of acquittal was sufficient to preserve the issue on appeal.

¶ 17. In determining whether the State presented sufficient evidence to meet the standard of threatening behavior, we "review the evidence presented by the State viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly sup-

ports a finding of guilt beyond a reasonable doubt." *State v. Brochu*, 2008 VT 21, ¶ 21, 183 Vt. 269, 949 A.2d 1035 (quotation omitted). In doing so, "[we] assess the strength and quality of the evidence; evidence that gives rise to mere suspicion of guilt or leaves guilt uncertain or dependent upon conjecture is insufficient." *State v. McAllister*, 2008 VT 3, ¶ 13, 183 Vt. 126, 945 A.2d 863 (quotation omitted). We find that the State did not present sufficient evidence to sustain a conviction for disorderly conduct.

¶ 18. The State summarized the evidence that it presented at trial as follows:

> Although calm when he first interacted with [the table volunteer], [defendant] became angrier and more aggressive after [she] attempted to end the conversation and turn her attention to others at the table. He moved to the front of the table and came closer, his voice increased in volume, and he became more forceful in what he was saying. At times, he would place his hands in his pockets; at other times, he would cross his arms across his chest; and at other times he was gesticulating with his hands. When [another witness] approached the table and attempted to calm [defendant], he yelled directly at her and approached within two feet of her, causing [her] to hold up a clipboard that she was carrying in order to form a barrier between herself and [defendant]. Several times [the volunteer] asked [defendant] to leave, and threatened to call the police, but he persisted.

We note that in the information the State defined the behavior that constituted the crime as "yelling aggressively." However the evidence is characterized, the facts relied upon by the State, when viewed in their entirety, do not enable a jury to reasonably conclude that defendant engaged in threatening behavior. See *State v. Malshuk*, 2004 VT 54, ¶ 12, 177 Vt. 475, 857 A.2d 282 (noting that to reverse a denial of a Rule 29 motion for acquittal, this Court must find that there was not enough evidence for a reasonable jury to conclude that defendant committed the charged offense). As the court stated in its instruction, the behavior must convey the intent to do harm to another person. We cannot find that defendant's actions conveyed such an intent.

¶ 19. We recognize that the table volunteer and the person registering to vote at the table testified that they felt threatened

by defendant's conduct, but in context, it is not clear they used the terminology in the same way as the trial court. The volunteer testified that she felt threatened and afraid from defendant's loud voice, anger, escalation of what he was saying and the manner he was saying it, and his refusal to leave when she requested that he do so. She also testified, however, that she didn't think that defendant was going to hit her, but she was not sure. She was on the other side of the table from him. The witness who was being registered to vote said she was scared and intimidated because she did not know what he would do and he was acting irrationally. She also stated that she did not remember defendant making any threats.

¶ 20. We must, however, judge defendant's conduct from the perspective of a reasonable person in the circumstances of the witnesses. Language may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, "as long as circumstances support the victim's fearful or apprehensive response." *Commonwealth v. Chou*, 741 N.E.2d 17, 22 (Mass. 2001). The circumstances here do not, however, support a threat to harm.

¶ 21. Courts from other jurisdictions have universally required more than mere anger or forcefulness to convict under identical disorderly conduct statutes. For instance, many courts have focused on the significance of a defendant making threats toward a particular person. The North Dakota Supreme Court in *City of Fargo v. Brennan* upheld the conviction of a man for disorderly conduct who was "really angry" largely because he directed his anger at a specific person, screaming "You're our No. 2 killer" and flailing his arms to the point that she "thought he was going to hit" her. 543 N.W.2d 240, 241, 245 (N.D. 1996). He targeted his victim personally, after recognizing her as an administrator of a women's health organization that he had picketed because it performed abortions. Under these circumstances, a jury reasonably could conclude that the defendant had threatened the victim. Similarly, the Oregon Court of Appeals, in affirming a disorderly conduct conviction, concluded that when a defendant "made a fist, and repeatedly punched his fist into his other hand," he made threatening gestures toward the owner of a gas station that constituted disorderly conduct. *State v. Miller*, 203 P.3d 319, 320-21 (Or. Ct. App. 2009). And in *State v. Silano*, the Connecticut

Appellate Court affirmed the conviction of a defendant who had put his fist in the face of his neighbor and told him to "get the hell out of here." 900 A.2d 540, 544, 548 (Conn. App. Ct. 2006). Defendant here, by contrast, did not target a specific individual, nor did he issue any overt or implied threats. As the trial court noted, his rantings were more "political in nature. It wasn't personal." Defendant apparently believes that Obama supporters are terrorists and it is his right to express this view — even angrily — however distasteful others might find it.

¶ 22. Defendant's conduct also lacked any significant physical component, which our sister courts have also emphasized is critical to a disorderly conduct conviction. In *City of Eugene v. Lee*, the Oregon Court of Appeals reversed the conviction of a street preacher under a city ordinance identical to the statute at issue in this case. 34 P.3d 690 (Or. Ct. App. 2001). The defendant was preaching to passersby on a pedestrian mall "in a loud voice," accusing them of various sins, calling them whores and drunkards, and telling them that they were going to hell. *Id.* at 691. Defendant's behavior was so inflammatory that one passerby "appeared to be on the verge on engaging defendant in a physical fight." *Id.* at 692. The Oregon court nevertheless reversed the preacher's conviction because there was "no evidence in the record that defendant engaged in any physical acts of aggression" and "no evidence that the arresting officer even believed that defendant was *about to* engage in any physical act of aggression." *Id.* at 694; see also *Silano*, 900 A.2d at 544 (noting that defendant poked neighbor in back of head, put fist in neighbor's face, and raised right arm with clenched fist); *Indrisano*, 640 A.2d at 996 (concluding that defendant had "acted with an unreasonable degree of force in wedging [a person] away from the door by using his shoulders and buttocks" and that this conduct constituted violent, tumultuous or threatening behavior). Similarly, defendant here, who was also preaching his views in a loud voice on a pedestrian mall, engaged in no physical conduct that was threatening in nature. Apparently, his arms at times "gesticulated" or were crossed, but neither witness highlighted this conduct as threatening. Defendant also stood about two feet from one witness at one point, but there was no indication that he was going to harm her.

¶ 23. The Massachusetts courts, while holding that an explicit threat is not required to satisfy the threat prong of the Massachusetts disorderly conduct statute, do require in the absence of

an explicit threat a "strong implication that harm may come to the victim" or a "comment or act coupled with an aggressive move toward the victim." *Commonwealth v. Cahill*, 834 N.E.2d 1238, 1240 (Mass. App. Ct. 2005), *rev'd on other grounds*, 847 N.E.2d 344 (Mass. 2006). Neither of these elements is present here.

¶ 24. The State relies most heavily on the fact that defendant's behavior escalated from calm to "angry" or "agitated" and on the forcefulness of his assertions. Defendant did not, however, direct threats against anyone, nor did he physically touch them, attempt to touch them, or threaten to touch them. He did not convey any intent to harm another person. He did not use profanity or abusive language. The duration of the incident, from the time that defendant first approached the table to his leaving, was only twenty minutes. Much of his conduct was not directed at anyone in particular. He instead ranted against the Obama candidacy, and though his speech was occasionally incoherent, it was entirely political in nature. Defendant, as one witness put it, "thought that that was the best way to let . . . people know what he thought and believed to be true" and "that he was informing [the passersby]." His speech may have been "adamant," "angry," and "inappropriate," but such speech, without more, cannot be considered a threat to harm another person.

¶ 25. We conclude that the trial court should have granted the motion for a judgment of acquittal because the evidence did not fairly and reasonably support the charge that defendant engaged in threatening behavior.

*The denial of the motion for a judgment of acquittal is reversed and defendant is acquitted.*