DOOLEY, J.
*822 ¶ 1. Defendant William Schenk was charged with two counts of disorderly conduct, in violation of 13 V.S.A. § 1026(a)(1), in connection with the distribution of Ku Klux Klan recruitment flyers in the City of Burlington. For each count, the State charged that the penalty should be enhanced under 13 V.S.A. § 1455 because the crime was hate-motivated. Defendant appeals the trial court's denial of his motion to dismiss the two disorderly conduct charges and the associated sentence enhancement. We hold that the State failed to establish a prima facie case because defendant's conduct conveyed neither the physical nor imminent threat of harm that we construe the definition of "threatening behavior" to require. Accordingly, we do not reach defendant's challenge to the application of the hate-motivated crime sentence enhancement. We reverse and grant defendant's motion to dismiss.
¶ 2. The facts may be summarized as follows. In late October 2015, two women in Burlington found flyers advertising the Ku Klux Klan at their homes. One of the women is Mexican American; the other is African American. One woman found the flyer folded up and inserted into the mailbox by her front door, while the other woman found the flyer tucked into her front door. The one-page flyer depicted a hooded and robed Klansman mounted on a horse and holding a burning cross. The Confederate flag and the colonial thirteen-star American flag are shown behind the horse and rider. Across the top of the flyer were the words: "Join the Klan and Save Our Land!!!!" The bottom of the flyer read "United Northern & Southern Knights of the Ku Klux Klan" and included a web address. The flyer had no other content. Neither woman saw this flyer at neighboring homes.
¶ 3. Burlington police canvassed the area where the flyers were found looking for other flyers, though they were unable to speak with some residents because those residents were not at home. Police also reached out through social media and the local news to determine whether any other flyers had been found. The only other reported sighting was at a local copy store, where an employee reported finding the flyer in one of the store's copy machines. Police viewed surveillance camera footage from the store and were able to identify defendant. The investigating detective then contacted defendant. Defendant admitted to distributing the flyers and explained that he is a Kleagle, a recruiter for the Ku Klux Klan. Defendant told the detective that he had distributed a total of thirty to forty flyers in neighborhoods that defendant described as "more white."
¶ 4. The State charged defendant with two counts of disorderly conduct under 13 V.S.A. § 1026(a)(1), which states that:
A person is guilty of disorderly conduct if he or she, with intent to cause public *823 inconvenience or annoyance, or recklessly creates a risk thereof ... engages in fighting or in violent, tumultuous, or threatening behavior ....
For each count, the charging information specifically alleged that defendant had "recklessly created a risk of public inconvenience or annoyance when he engaged in threatening behavior, TO WIT, by anonymously placing a flyer endorsing the Ku Klux Klan." The State also sought a hate-motivated crime sentence enhancement under 13 V.S.A. § 1455.[1]
¶ 5. Defendant filed a motion to dismiss the charges under Vermont Rule of Criminal Procedure 12(b)(2)(B), which permits a defendant to raise at any time "a claim that the indictment or information fails to state an offense." As the court noted in its decision, the motion to dismiss for failure to state an offense was essentially converted into a motion to dismiss for lack of a prima facie case under Rule 12(d). In his motion, defendant argued that his conduct was protected speech under the U.S. Constitution's First Amendment and that his speech did not fall into any of the narrow categories of unprotected speech, such as true threats. The trial court held an evidentiary hearing on defendant's motion at which the two alleged victims and the investigating police officer testified. The court applied the standard for whether the State demonstrated a prima facie case: "whether, taking the evidence in the light most favorable to the state and excluding modifying evidence, the state has produced evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt." State v. Dixon, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999) (quotation omitted). The court concluded in a written order that defendant's conduct was the kind of threatening behavior proscribed by 13 V.S.A. § 1026(a)(1), the disorderly conduct statute. The court correctly noted that this Court has construed this statute such that correct application of the threatening behavior provision steers away from constitutional infirmity. See State v. Albarelli, 2011 VT 24, 189 Vt. 293, 19 A.3d 130. The court read Albarelli to list five factors, including: (1) whether the conduct would be considered threatening to a reasonable witness; (2) whether the conduct was directed at a particular person; (3) whether the conduct included only speech or also included a significant physical component; (4) whether the conduct carried a strong implication of imminent harm to the victim; and (5) whether the conduct conveyed the charged level of intent to harm, in this case, recklessness.
¶ 6. The court considered each of these factors in turn, concluding that each weighed against dismissal. The court found it particularly persuasive that defendant had entered the curtilage of each alleged victim's home, an area that the court noted typically bears a heightened expectation of privacy. The court's decision also placed great weight on the content of the flyers distributed by defendant, reasoning for example that because "the Klan name and imagery, particularly the image of a burning cross, implies impending harm," defendant's conduct carried a strong implication of harm. The court summarized its decision as follows: "[T]he nature of the flyer and placement of the flyer in a part of the complaining witnesses' homes, where the *824 recipients are members of an ethnic group historically targeted for violence by the Klan, results in the conclusion that the Defendant used the flyer as a tool to convey a strong message of intimidation and the potential for harm."
¶ 7. Following the trial court's denial of his motion to dismiss, defendant entered a conditional guilty plea, reserving the right to appeal the trial court's decision. Defendant was sentenced to concurrent terms of 119 to 120 days, with credit for time served. This appeal followed.
¶ 8. On appeal, defendant raises both facial and as-applied constitutional arguments. He essentially asks this Court to hold that either the disorderly conduct statute reaches only physical behavior, and speech can never serve as the basis for a charge under the statute, or that the statute can reach speech and, as such, either unconstitutionally regulates free speech under the First Amendment or prohibits only unprotected true threats. If the statute does reach true threats, defendant argues that his speech does not convey the imminent harm that defendant argues is necessary to find a true threat under U.S. Supreme Court caselaw.
¶ 9. It is fair to say from the briefing that the parties center their arguments on whether defendant's conduct can be found to involve a true threat such that defendant's speech was not protected by the First Amendment to the U.S. Constitution. The U.S. Supreme Court has held in two main cases that true threats are not constitutionally protected: Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), and Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). Watts is brief and generally provides that speech constituting a true threat is not protected by the First Amendment but offers little explanation of what constitutes a true threat. Watts, 394 U.S. at 707-08, 89 S.Ct. 1399. Virginia v. Black provides some more guidance on the definition of a true threat: " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359, 123 S.Ct. 1536 (plurality opinion). The decision goes on:
[A] prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so .... [T]he history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.
Id. at 360, 123 S.Ct. 1536 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ).
¶ 10. We cannot decide this case on the constitutional issues raised by the parties unless it is clear that the State has made out a prima facie case that defendant has violated the statute under which he is charged. In arguing the constitutional question, the parties are assuming that a true threat will violate the statute. We must examine this assumption. This method of proceeding is required by our policy to decide cases on nonconstitutional grounds if possible, and to adopt a construction of the statute that avoids constitutional *825 deficiencies. See State v. Read, 165 Vt. 141, 146, 680 A.2d 944, 947 (1996) ("[W]e will not reach challenges based on facial unconstitutionality if there is a readily apparent construction that suggests itself as a vehicle for rehabilitating the statute." (quotation and alteration omitted) ).
¶ 11. Defendant is accused of threatening behavior. We have relevant decisions of this Court in two contexts explaining the meaning of "threatening behavior." The first is decisions construing this language in cases brought under the statute before us here, 13 V.S.A. § 1026(a)(1). In construing this statute, we have held that behavior is threatening when it communicates a threat-"[a] threat is a communicated intent to inflict harm on person or property." State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).
¶ 12. The most recent decision construing this language is State v. Albarelli, in which the defendant was charged with disorderly conduct in violation of 13 V.S.A. § 1026(a)(1). In Albarelli, the defendant was charged under the same prong of the disorderly conduct statute as defendant here-with threatening behavior-after he approached a "Vermonters for Hope" table on the Church Street Mall in Burlington and began "ranting about the Obama candidacy." His hands were in his pockets for most of the time, though occasionally he "gestur[ed] wildly." This behavior lasted for approximately twenty minutes. Albarelli, 2011 VT 24, ¶ 2, 189 Vt. 293, 19 A.3d 130. The table volunteers testified that they felt threatened and nervous, and that they found the defendant's conduct disruptive.
¶ 13. Albarelli went further than earlier decisions in describing the elements of the crime. We noted that "[d]isorderly conduct statutes have long raised free speech concerns." 2011 VT 24, ¶ 9, 189 Vt. 293, 19 A.3d 130. To avoid constitutional infirmity "the language of the statute [prohibiting threatening behavior] properly interpreted proscribes conduct, not speech, and therefore does not penalize speech." Id. Further, we held that "threatening behavior" creates an objective standard-whether a reasonable person would conclude a defendant's conduct was threatening-not a subjective standard-whether the recipient of a defendant's allegedly threatening behavior perceived that behavior as a threat. Id. ¶¶ 13-14. Thus, the reaction of the "table volunteers" was irrelevant to whether the defendant committed the crime in Albarelli. Although the decision did not specify required elements of threatening behavior, it relied upon the absence of circumstances that are typically relied upon to find guilt. These include whether the threatening behavior was directed at a particular person, the threatening behavior contained a significant physical component, the strong implication that harm may come to the victim, and a comment or act coupled with an aggressive move toward the victim. Id. ¶¶ 21-23. In concluding that the defendant could not be found guilty of the crime, the Court stated that "[d]efendant did not, however, direct threats against anyone, nor did he physically touch them, attempt to touch them, or threaten to touch them. He did not convey any intent to harm another person." Id. ¶ 24.
¶ 14. In the second context in which we have considered "threatening behavior," we have several times over considered whether a probationer has violated a condition of probation prohibiting him or her from engaging in threatening behavior. One of these cases, decided shortly after Albarelli, in particular defines the contours of expressive conduct as threatening behavior. In State v. Sanville, we held that this probation condition was impermissibly vague as applied to the charged violation in that case.
*826 2011 VT 34, ¶ 10, 189 Vt. 626, 22 A.3d 450 (mem.). The Sanville probationer was in a dispute with the landlord of his mobile home, and the landlord began eviction proceedings. The probationer was charged with violating the threatening behavior condition after he shouted at his landlord, including telling the landlord that he would burn down the mobile home and "kick [landlord and her husband's] butts." Id. ¶ 3 (alteration in original). The probationer did not make any physical gesture toward his landlord, though the landlord did state that the probationer would "start to get huffy." Id. We held that the probationer could not have had notice that his behavior would violate the condition prohibiting threatening behavior because his behavior did not meet our caselaw's standard for threatening behavior-the behavior "did not necessarily 'communicate intent to inflict physical or other harm.' " Id. ¶ 12 (quoting State v. Ashley, 161 Vt. 65, 72, 632 A.2d 1368, 1372 (1993) ).
¶ 15. Sanville is particularly significant because the State argued that the probationer had committed the crime of disorderly conduct under 13 V.S.A. § 1026(a)(1) by engaging in threatening behavior, and that this crime constituted the basis for his probation violation. Id. We rejected that argument, holding that the verbal threats did not violate the statute because the statute proscribes conduct, not speech, citing Albarelli.[2] Id. Sanville is a controlling precedent for the question before us today.
¶ 16. Two other cases addressing the same probation condition are related to Sanville, but neither is helpful to the question before us today. See State v. Johnstone, 2013 VT 57, 194 Vt. 230, 75 A.3d 642 (holding condition prohibiting threatening behavior not violated where probationer was alleged to have violated condition when overheard telling bystander that his probation officer would "end up in a body bag" but statement was not communicated directly to probation officer); State v. Miles, 2011 VT 6, 189 Vt. 564, 15 A.3d 596 (mem.) (holding condition prohibiting threatening behavior not violated because objectively reasonable person would not judge message as serious threat to harm where probationer was charged with violating condition after he told mental health nurse, while he was incarcerated in mental health unit of correctional center, that he intended to kill one Bill Brown who, probationer claimed, "was getting into his head through thoughts and the television").
¶ 17. Johnstone noted that Sanville had not specifically addressed whether pure speech could violate the probation condition, and it refused to answer that question, but nonetheless narrowed the meaning of the condition to apply only to behavior that was intended to put the target of the threat in fear of harm. 2013 VT 57, ¶ 17. It did not address whether defendant's actions could be found to violate the criminal statute, § 1026(a)(1), and is not inconsistent with Sanville.
¶ 18. Miles preceded Sanville. Like Johnstone, it noted that we had not decided whether speech alone could violate the probation condition prohibiting threatening behavior and declined to address that question. 2011 VT 6, ¶ 8, 189 Vt. 564, 15 A.3d 596. Also as in Johnstone, we concluded that the trial court could not find that the defendant intended to put the target of the threat in fear of bodily harm because the defendant was delusional and there was no evidence that the target existed or that the threat was real. Id. Finally, like Johnstone, Miles did not address *827 whether defendant's verbal threats could be found to have violated the criminal statute, 13 V.S.A. § 1026(a)(1).
¶ 19. There are also relevant and helpful decisions from courts in other jurisdictions. As we explained in Cole, much of the language of § 1026 was derived from § 250.2(1) of the Model Penal Code, including a variant of the "threatening behavior" language.[3] 150 Vt. at 455, 554 A.2d at 255 ; see also Read, 165 Vt. at 147, 680 A.2d at 948 (noting that "[i]n 1972, the Legislature amended Vermont's 'breach of the peace' statute to follow the 'disorderly conduct' language of Model Penal Code § 250.2(1)"). As a result, many states have statutes that use this or similar language to define crimes of disorderly conduct or breach of the peace. See Albarelli, 2011 VT 24, ¶ 9, 189 Vt. 293, 19 A.3d 130 (noting several states have modeled disorderly conduct statutes after Model Penal Code language and listing examples).
¶ 20. Cases from two states-Oregon and Connecticut-are particularly helpful in addressing the statutory construction issue before us because in both states, the statutory language is identical to that in 13 V.S.A. § 1026(a)(1).[4] In Oregon, the leading case is State v. Cantwell, 66 Or.App. 848, 676 P.2d 353 (1984), one of the cases we relied on in Albarelli for the proposition that § 1026(a)(1) criminalizes behavior, not speech. See Albarelli, 2011 VT 24, ¶ 9, 189 Vt. 293, 19 A.3d 130. The issue in Cantwell was whether the threatening behavior language of the Oregon disorderly conduct statute was overbroad in violation of the Oregon Constitution. 676 P.2d at 356-57. The court held the language was not overbroad, in part by adopting a narrowing interpretation of the statutory language:
We next consider defendants' contention that [the disorderly conduct statute] is overbroad in violation of [the Oregon Constitution], and, if so, whether a saving construction is possible. A criminal law is overbroad if it purports to reach activities that are constitutionally protected. [The statute] makes it a crime to engage in "fighting or in violent, tumultuous or threatening behavior" with the intent to cause, or recklessly creating a risk of, public inconvenience, annoyance or alarm. Defendants argue that, under certain circumstances, "behavior" could include actual or symbolic constitutionally-protected speech. We do not read the statute to encompass speech in the term "behavior," but construe it to refer only to physical acts of violence ..... "[F]ighting" and "violent, tumultuous or threatening behavior" describe physical acts of aggression, not speech, and in prohibiting such physical acts [the statute] does not run afoul of [the Oregon Constitution].
....
We hold that [the statute] makes unlawful only the use of physical force or *828 physical conduct which is immediately likely to produce the use of such force and which is intended to create or recklessly creates a risk of public inconvenience, annoyance or alarm.
Id. (citations omitted).[5] Since Cantwell, the Oregon courts have consistently ruled that threatening behavior cannot be proven by speech alone. See State v. Hosley, 282 Or.App. 880, 388 P.3d 387, 389 (2016) (describing Oregon decisions); State v. Wade, 278 Or.App. 669, 377 P.3d 660, 663 (2016) ; State v. Richardson, 277 Or.App. 112, 370 P.3d 548, 551-52 (2016) ; State v. Kreft, 270 Or.App. 150, 346 P.3d 1294, 1298 (2015) ; State v. Miller, 226 Or.App. 314, 203 P.3d 319, 321-22 (2009) ; State v. Atwood, 195 Or.App. 490, 98 P.3d 751, 755-56 (2004) ; State ex rel. Juvenile Dep't of Union Cty. v. Krieger, 177 Or.App. 156, 33 P.3d 351, 352-53 (2001).
¶ 21. Hosley is instructive in applying the construction of the Oregon disorderly conduct statute. The defendant in that case, while walking in front of a neighbor's yard, talked with and picked up and hugged the neighbor's seven-year-old daughter and became emotional in doing so. He said he wanted a girl as pretty as her. A day later, the defendant placed a letter on the neighbor's porch, which thanked the neighbor for his understanding in a difficult time, but also included a page containing a "promise," with a signature line for the young girl and a signature line on which the defendant had already signed his name. Above the signature lines, the page set out a promise that "[i]f any boy or older man ever touches my privates or hurts me in any bad way, I promise I will tell my daddy." Hosley, 388 P.3d at 388 (alteration omitted).
¶ 22. The Oregon court held that neither defendant's actions nor his letter met the standard of physical force or physical conduct which is immediately likely to produce the use of physical force. Id. at 390. With respect to the argument that the physical act was the delivery of the letter to the neighbor's porch, the court held:
[W]e reject the state's contention that the communicative act of leaving a letter can support defendant's disorderly conduct conviction. The statute does not reach physical conduct that is actual but incidental to a defendant's speech. We have specifically exempted physical acts that are a common method of gaining someone's attention, such as banging on a door and shouting for someone to open it. When defendant left the letter on T's porch, he engaged in a common method of gaining someone's attention, and that communicative act is not proscribed by [the disorderly conduct statute].
Id. at 389-90 (citations and quotations omitted).
¶ 23. In Connecticut, the critical decision is State v. Lo Sacco, a case that involves the same disorderly conduct language as 13 V.S.A. § 1026(a)(1) in the context of a domestic violence incident. 12 Conn.App. 481, 531 A.2d 184 (1987). The court reached its interpretation of threatening behavior as follows:
"Violent" is defined as "characterized by extreme force" and "furious or vehement to the point of being improper, unjust, or illegal." "Threatening" is defined as a "promise [of] punishment" or, "to give signs of the approach of (something evil or unpleasant)." When two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship *829 with other associated words and phrases under the doctrine of noscitur a sociis. Placed within the context of the other words in the statute, the word "threatening" takes on a more ominous tone. The statute proscribes "engaging in fighting or in violent, tumultuous, or threatening behavior." In State v. Duhan, [38 Conn.Supp. 665, 460 A.2d 496 (1982) ], the Appellate Session of the Superior Court defined "tumultuous" as "riotous" and "turbulent." Fighting, by its plain meaning, involves physical force. We conclude that the language of [the disorderly conduct statute] involved in this case, namely, "violent or threatening behavior," evinces a legislative intent to proscribe conduct which actually involves physical violence or portends imminent physical violence.
Id. at 189-90 (citations and quotations omitted). The reasoning and decision of the court in Lo Sacco was endorsed by the Connecticut Supreme Court in State v. Indrisano in order to hold that the statute as interpreted was not unconstitutionally vague. 228 Conn. 795, 640 A.2d 986, 995 (1994). In State v. Szymkiewicz, the Connecticut Supreme Court further explained its construction of the disorderly conduct statute by holding that a conviction for threatening behavior could be upheld if the offending conduct was pure speech without a physical component but only if the speech involved "fighting words." 237 Conn. 613, 678 A.2d 473, 478 (1996). It defined fighting words as "speech that has a direct tendency to cause imminent acts of violence or an immediate breach of the peace. Such speech must be of such a nature that it is 'likely to provoke the average person to retaliation.' " Id. at 478 (quoting Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ); see also State v. Baccala, 326 Conn. 232, 163 A.3d 1, 13, 15-16 (2017) (reaffirming Szymkiewicz, but holding that customer angrily calling supermarket manager "fat ugly bitch" and "cunt" and saying "fuck you, you're not a manager" was not disorderly conduct because terms were not fighting words).
¶ 24. The courts in Connecticut and Oregon reached essentially the same statutory construction but for different reasons. The Oregon court adopted a narrowing construction limiting the reach of the statute to improper conduct in order to hold the statute was not vague or overbroad.[6] The Connecticut court adopted its construction *830 based on normal statutory interpretation methodology, although the Connecticut Supreme Court in Indrisano adopted the construction in part to respond to a vagueness challenge to the statute. We agree with both rationales for reaching this construction.
¶ 25. There is also a third reason for us to adopt this construction. As we noted in Cole, § 1026 is really "a criminal public nuisance statute." 150 Vt. at 455-56, 554 A.2d at 255. This is shown by the statute's element of "public inconvenience, or annoyance," the statute's placement in the chapter on "Breach of the Peace; Disturbances," 13 V.S.A. ch. 19, and the name of the crime as "Disorderly conduct." Thus, the statute's intent is less about protecting individuals from threats and more about protecting the public from breaches of the public order caused by threats.
¶ 26. In fact, Vermont has a general criminal statute that defines a misdemeanor *831 crime of threats of violence to persons, but defendant was not charged under it.[7] Section 1702 of Title 13 is entitled "Criminal threatening" and provides:
(a) A person shall not by words or conduct knowingly:
(1) threaten another person; and
(2) as a result of the threat, place the other person in reasonable apprehension of death or serious bodily injury.
(b) A person who violates subsection (a) of this section shall be imprisoned not more than one year or fined not more than $1000.00, or both.
The statute goes on to define serious bodily injury as bodily injury that creates "a substantial risk of death, ... a substantial loss or impairment of the function of any bodily member or organ; ... a substantial impairment of health; or ... substantial disfigurement." Id. § 1702(d)(1) (incorporating definition of serious bodily injury in 13 V.S.A. § 1021(a)(2) ). It also provides that " '[t]hreat' and 'threaten' shall not include constitutionally protected activity." Id. § 1702(d)(2).
¶ 27. Our point is that a construction of § 1026(a)(1) that limits the statute's coverage to threatening conduct and doesn't cover threatening speech does not leave our law without a crime for speech that threatens personal violence. Indeed, the Legislature may have enacted § 1702 *832 based on a concern that the disorderly conduct statute would not prohibit pure speech. Thus, § 1702 specifically addresses threatening speech and acknowledges that such a crime can extend only as far as the First Amendment allows. The presence of this statute is an indication that "threatening behavior," as criminalized in § 1026(a)(1) should not extend to threatening speech.
¶ 28. Although the Connecticut court did not rely on this rationale for its decision to construe the threatening behavior statutes to include threatening speech, we note that the same situation applies in Connecticut. The Connecticut legislature has enacted statutes that criminalize speech that threatens violence to a person, and these statutes have been challenged as inconsistent with the First Amendment. See Conn. Gen. Stat. Ann. § 53a-181(a)(3) ("A person is guilty of a breach of the peace ... when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person ... threatens to commit any crime against another person or such other person's property"). The Connecticut court has held that these statutes can be applied only to true threats to stay within constitutional limits. See State v. Krijger, 313 Conn. 434, 97 A.3d 946, 956 (2014) (holding that conviction under § 53a-181(a)(3) requires state "to prove beyond a reasonable doubt that [the defendant's] statements represented a true threat"). The Connecticut court has not recognized a true-threat requirement with respect to charges of threatening behavior because that charge under the Lo Sacco construction of the language does not involve speech.[8] Id.
¶ 29. For the reasons stated in Cantwell and Lo Sacco, as well as adherence to our own precedent in Sanville, we adopt the construction of the term "threatening behavior" in those cases. We provide the following explanations of this construction's application.
¶ 30. In Albarelli, we held that the disorderly conduct statute proscribing threatening behavior "proscribes conduct, not speech, and therefore does not penalize speech." 2011 VT 24, ¶ 9, 189 Vt. 293, 19 A.3d 130. In a later paragraph, however, we relied upon a Massachusetts decision to state "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, 'as long as circumstances support the victim's fearful or apprehensive response.' " Id. ¶ 20 (quoting Commonwealth v. Chou, 433 Mass. 229, 741 N.E.2d 17, 22 (2001) ). These statements are at least arguably inconsistent, particularly if the latter is interpreted to apply when the "threatened behavior" is entirely or primarily speech. We clarify the statement that speech can be relevant to explain whether threatening behavior has occurred but only where the behavior is physical conduct and not speech. Oregon cases explain this use of speech. See Richardson, 370 P.3d at 551-52 (explaining that Oregon statute "does not reach physical conduct that is actual but incidental to ... speech," including speech that is "a common method of gaining someone's attention" (quotation omitted) ). For example, a person using one hand to punch the other hand is more likely to be engaging in threatening behavior if the physical activity is accompanied by threatening statements than if not.
¶ 31. We do not adopt the holding of Szymkiewicz that threatening behavior can be composed of fighting words despite the *833 fact that the behavior is uttering speech. In Read, 165 Vt. at 148, 680 A.2d at 948, we adopted a construction of the "abusive language" prong of 13 V.S.A. § 1026(a)(3) that limits the statute's reach to "fighting words" as defined in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). More recently, in State v. Tracy, we questioned the continued vitality of the fighting words exception. 2015 VT 111, ¶¶ 16-17, 200 Vt. 216, 130 A.3d 196. Thus, we further narrowed the reach of § 1026(a)(3) :
For these reasons, if § 1026(a)(3) has any continuing force, it is necessarily exceedingly narrow in scope. The use of foul language and vulgar insults is insufficient. A likelihood of arousing animosity or inflaming anger is insufficient. The likelihood that the listener will feel an impulse to respond angrily or even forcefully is insufficient. The provision only reaches speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline.
Id. ¶ 38. Even if the fighting words doctrine has continuing vitality, we would not apply it to the threatening behavior prong of § 1026, which has a different scope and purpose than the "abusive language" prong.
¶ 32. The definition of violent or threatening behavior in the Oregon cases-"physical force or physical conduct which is immediately likely to produce the use of such force"-is very similar to that in the Connecticut cases-"physical violence or portends imminent physical violence." We adopt the Oregon definition, with our explanation that speech can be introduced to explain or provide context for physical conduct.
¶ 33. We turn now to the trial court's decision on defendant's motion to dismiss. We apply the standard for a prima facie case pursuant to V.R.Cr.P. 12(d)(2). See supra, ¶ 5; State v. Hutchins, 2005 VT 47, ¶ 6, 178 Vt. 551, 878 A.2d 241 (mem.) (we "determine whether the State met its burden in demonstrating that it had substantial, admissible evidence as to the elements of the offense challenged by the defendant's motion" and "we view the evidence in the light most favorable to the State, and exclude modifying evidence, to determine if the evidence can fairly and reasonably establish defendant's guilt beyond a reasonable doubt" (quotation omitted) ). Since defendant's leaving of the flyers at the homes of the two women constituted speech and not nonspeech behavior, it does not fall within the disorderly conduct statute, 13 V.S.A. § 1026(a)(1), which criminalizes conduct that is not speech. The trial court answered the need for a physical threat by relying on the fact that defendant entered the curtilage of the alleged victims' homes and placed the flyer in the recipients' mailbox or between their doors. We agree with the decision in Hosley that a method of delivery that is incidental to the speech alleged to be the threat cannot meet the requirement for physical conduct. See 388 P.3d at 389-90.
¶ 34. Further, even if the statute could be violated by pure speech, the charged conduct would also need to convey the imminent threat of harm, which the conduct in this case does not. The flyer is a recruitment solicitation-its overt message is to join the Ku Klux Klan. It contains no explicit statement of threat. To the extent it conveys a message of personal threat to the recipient, it is that the Klan will recruit members and inflict harm in the future. The flyer itself is not "immediately likely to produce" force and harm. Cantwell, 676 P.2d at 357.
¶ 35. For the above reasons, we hold that the State has not demonstrated that it *834 has a prima facie case that defendant violated 13 V.S.A. § 1026(a)(1). The State's evidence cannot establish defendant's guilt beyond a reasonable doubt. The motion to dismiss the two disorderly conduct charges must be granted.
¶ 36. We need not reach whether defendant's conduct included a true threat. Even if defendant's speech contained a true threat, it would not violate the statute under which defendant was charged as we have construed that statute here and as explained above. In reaching this conclusion, we do recognize that any communication from the Ku Klux Klan complete with symbols of the Klan, particularly the burning cross, would raise concern and fear in a reasonable person who is a member of an ethnic or racial minority. We are not ruling today whether the Legislature can make criminal such action or has done so in a different statute. Our ruling today is only that defendant's conduct does not violate the specific statute under which he was charged, 13 V.S.A. § 1026(a)(1).
¶ 37. Because of our decision dismissing the disorderly conduct charges against defendant, we also need not reach the issues related to the hate-motivated sentence enhancement provided by 13 V.S.A. § 1455.
Reversed.

13 V.S.A. § 1455 applies when the person has committed "any crime" and the conduct involved is "maliciously motivated by the victim's actual or perceived race, color, religion, national origin, sex, ancestry, age, service in the U.S. Armed Forces, disability as defined by 21 V.S.A. § 495d(5), sexual orientation, or gender identity." The effect of a determination that the crime was hate-motivated is to enhance the maximum sentence for the crime.

The dissent finds Sanville unimportant because it is a probation violation case. We disagree. It construes § 1026(a)(1) in a manner directly contrary to the dissent's construction. To adopt the dissent's position, we would have to overrule Sanville.

The relevant section of the Model Penal Code has language that significantly differs from that enacted by the Vermont Legislature in § 1026(a)(1). The Model Penal Code section provides that a person is guilty of disorderly conduct if, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," the person "engages in fighting or threatening, or in violent or tumultuous behavior." Model Penal Code § 250.2(1)(a). As the dissent acknowledges, the free-standing word "threatening" does not modify the word "behavior" in the Model Penal Code provision as it clearly does in § 1026(a)(1). Without the tie to behavior, we acknowledge that the statement in the Commentary that the statute covers speech alone is consistent with the statutory language. It is the tie to behavior in § 1026(a)(1) that leads to a different result.

The majority of appellate decisions construing statutory language based at least in part on § 250.2(1) of the Model Penal Code come from these two states.

In State v. Begins, we relied upon the second holding of Cantwell that the statute was not void for vagueness. 147 Vt. 45, 48, 509 A.2d 1007, 1009 (1986). That holding also relies upon the narrowing construction of the statute as set out in the text above. See Cantwell, 676 P.2d at 357.

The dissent's argument that the narrowing construction adopted by the Oregon courts is unnecessary is premised on the unspoken conclusion that the only issue is whether the statute is overbroad. We relied upon the construction of the language in Cantwell to hold that the statute was not void for vagueness with respect to § 1026's prefatory language. See State v. Begins, 147 Vt. at 48, 509 A.2d at 1009 (noting Cantwell held statute not void for vagueness where fighting or violent, tumultuous, or threatening behavior was intended to create or recklessly created risk of public inconvenience, annoyance, or harm). Certainly, our history with respect to the "threatening behavior" language demonstrates continuing concern over the difficulties in interpreting the language. See Johnstone, 2013 VT 57, ¶¶ 20-21, 194 Vt. 230, 75 A.3d 642 (Dooley, J., concurring). The dissent's solution, to incorporate the true threats doctrine into the statute, makes the interpretation of the statutory language as applied to pure speech even more uncertain. The U.S. Supreme Court has never adopted a comprehensive definition of a true threat, and it is not a term with a historic and well-developed meaning. The U.S. Supreme Court's guidance is limited to a few sentences in Virginia v. Black. Thus, we must look to decisions in other jurisdictions, many of which are conflicting, to develop an adequate definition and scope to apply to individual cases.
A sampling of cases, including some of those cited by the dissent, illustrates this point. For example, in United States v. Turner, the Second Circuit held that a true threat can be both "conditional and inexplicit." 720 F.3d 411, 424 (2013). The court reiterated its own prior precedent to the effect that " 'an absence of explicitly threatening language does not preclude the finding of a threat[,] and, of course, a conditional threat-e.g., 'your money or your life'-is nonetheless a threat.' " Id. (alteration omitted) (quoting United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994) ).
In contrast, the Third Circuit has interpreted Watts v. United States to require that a true threat be unconditional. That court, writing six years after Virginia v. Black, cited Watts for the premise that "while advocating violence that is not imminent and unlikely to occur is protected, speech that constitutes a 'true threat' is not."United States v. Fullmer, 584 F.3d 132, 154 (2009) (citing Watts, 394 U.S. at 708, 89 S.Ct. 1399 ). This language suggests that speech loses constitutional protection under the doctrine of true threats only if the speech conveys a threat both imminent and likely to occur. This reading is supported by the Fullmer court's decision, which examined the context of the threats at issue in that case and concluded that "[d]efendants used past incidents to instill fear in future targets," and "given the success of the campaign in the past, including the destruction of private property and the telecommunication attacks on various companies, the implied threats were not conditional, and this speech rightly instilled fear in the listeners." Id. at 156 (emphasis added). As the court explained, the defendants' actions met "the standard of a 'true threat' as articulated in Watts." Id.
Fullmer does not cite or discuss Black in its true threats analysis. Indeed, not all recent U.S. Supreme Court First Amendment cases list true threats among the categories of unprotected speech. In United States v. Stevens, the Court was asked to rule that depictions of animal cruelty were a categorically unprotected class of speech. 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). The Court wrote that:
From 1791 to the present, ... the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations. These historic and traditional categories long familiar to the bar-including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct-are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.
Id. at 468-69, 130 S.Ct. 1577 (quotations, citations, and alterations omitted); see also Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (listing limited areas of unprotected speech "such as obscenity, incitement, and fighting words" (citations omitted) ). But see United States v. Alvarez, 567 U.S. 709, 717-18, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (citing Watts and including true threats among categories of unprotected speech). We do not read too much into the Court's omission of true threats in the language above. The point is simply that this omission coupled with at least one circuit's reliance on Watts rather than Black for the definition of a true threat supports construing § 1026(a)(1)'s threatening behavior provision such that the statute avoids the constitutional question.
The situation here is much different from that in Read, 165 Vt. at 148, 680 A.2d at 948, which narrowed the term "abusive language" in 13 V.S.A. § 1026(3) to fighting words, a well-developed and understood concept in American law.

This statute became effective on July 1, 2016. See 2015, No. 162 (Adj. Sess.), §§ 6b, 7. Because defendant was not charged under this statute, and, given the timing of the charge in this case and § 1702's enactment date, could not have been charged under this statute, we do not address whether the State has shown a prima facie case that defendant violated it. We are unwilling also to speculate, as the dissent does, that this statute is too narrow to cover threats to the public. We note, for example, that a threat to explode a bomb in a shopping mall is a threat to harm the persons who are in it when the threat is made. Further, § 1702 indicates that the Legislature is less concerned with a threat that the person who utters it cannot carry out. The inability to carry out the threat is an affirmative defense under the statute. See 13 V.S.A. § 1702(f). What the dissent sees as an unexplained gap in coverage may be a legislative decision not to extend the coverage as far as the dissent would want.
Likewise, the "mixed bag" that the dissent sees in the Legislature's use of the words "threat" and "threatening behavior" across several statutes, post, ¶ 44, may actually indicate that these terms are used consistently across statutes. Three of the statutes discussed by the dissent use the word "threat" rather than "threatening behavior," and each of these three references can be understood to refer to a pure speech threat, with no accompanying physical conduct. First, 13 V.S.A. § 1027(a) provides that a person commits the offense of disturbing the peace by use of telephonic or other electronic communication if the person, "with intent to ... threaten ... makes contact by means of a telephonic or other electronic communication with another and ... threatens to inflict injury or physical harm to the person or property of any person." Given that this statute's reach is limited to threats conveyed by either telephone or electronic communication-i.e., through media that by its nature is not dependent on in-person contact between perpetrator and subject-it would be illogical to require a physical component to a threat for purposes of this statute. Thus, this statute's reference to threats rather than threatening behavior is consistent with our interpretation of threatening behavior under § 1026(a)(1).
Second, as discussed above, 13 V.S.A. § 1702(a) refers solely to threats, and not to threatening behavior. And since the Legislature saw fit to expressly limit the application of this statute to stay within the confines of the First Amendment, see id. § 1702(d)(2), it is reasonable to conclude that § 1702's reference to threats is meant to address threats conveyed through speech without accompanying physical conduct. Thus, § 1702 is also consistent with our interpretation of threatening behavior under § 1026(a)(1). Finally, 13 V.S.A. § 1026a refers to both threats and threatening behavior, which supports the conclusion that these two terms have two different meanings. Again, this statute is consistent with our reading of threatening behavior under § 1026(a)(1).

After Szymkiewicz, speech can be "threatening behavior," but only if it contains fighting words, a requirement different from a true threat. As we explain in the text, we do not adopt this requirement.